IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS and MONTANA ENVIRONMENTAL INFORMATION CENTER,<br><br>　　　　　　　Plaintiffs,<br><br>vs.<br><br>RYAN ZINKE, in his official capacity of Secretary of the Interior; *et al.*,<br><br>　　　　　　　Defendants,<br><br>vs.<br><br>SPRING CREEK COAL LLC,<br><br>　　　　　　　Intervenor. | CV 17-80-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

Plaintiffs WildEarth Guardians ("WildEarth") and Montana Environmental Information Center ("MEIC") bring this action challenging Federal Defendants' approval of a mining plan modification for the Spring Creek Mine located in southeastern Montana.  (Doc. 1.)  Currently pending before the Court are the parties' and Intervenor Defendant Spring Creek Coal LLC's ("Spring Creek") cross-motions for summary judgment.  (Docs. 37, 59, 62.)

Having reviewed the parties' arguments and submissions, the Court makes the following findings and recommendations.

1

## I.    Background

This lawsuit follows a prior action in this Court before U.S. District Judge

Susan P. Watters, in which WildEarth challenged the same mining plan

modification that is at issue here.  *WildEarth Guardians v. U.S. Office of Surface*

*Mining, Reclamation & Enf't, et al.*, 14-CV-13-BLG-SPW-CSO ("*WildEarth I*").

The earlier litigation resulted in summary judgment in favor of WildEarth, with the

Court finding the Office of Surface Mining Reclamation and Enforcement

("OSM") violated the public participation and notice provisions of the National

Environmental Policy Act ("NEPA"), and failed to take the requisite "hard look" at

the consequences of approving the mining plan modification.  *WildEarth I,* 2016

WL 259285 (D. Mont. Jan. 21, 2016).  The Court, therefore, remanded the matter

to OSM for further proceedings, but allowed mining to continue pending remand.

*Id.* at *3.

The Spring Creek Mine is a surface coal mine located in Big Horn County,

Montana, approximately 32 miles north of Sheridan, Wyoming.  (A.R. 10723.)

Coal has been mined on a commercial scale at the mine since 1979.  (A.R. 10723.)

In 2005, Spring Creek filed an application with the BLM to lease an

additional 1,117.7 acres of federal coal in order to extend the life of the mine.

(A.R. 10724.)  After completing an Environmental Assessment ("EA") and issuing

a Finding of No Significant Impact ("FONSI"), BLM issued the lease to Spring

Creek, effective December 1, 2007 (referred to as "Federal Coal Lease MTM 94378"). (A.R. 10724.)

In 2008, Spring Creek submitted a permit application to the state to extend coal mining onto Federal Coal Lease MTM 94378. (A.R. 10727.) In June 2011, the Montana Department of Environmental Quality approved the permit. (A.R. 10727.) Spring Creek also proposed a mining plan modification to OSM for the lease. (A.R. 10727.) On June 5, 2012, OSM issued a FONSI, and the mining plan modification was approved. (A.R. 10727.)

In February 2013, conservation groups sued, and as mentioned, the matter was remanded for further proceedings in January 2016. *WildEarth I,* 2016 WL 259285 (Jan. 21, 2016). In response to the Court's ruling, OSM prepared an updated EA in September 2016 (A.R. 10710-815), reissued a FONSI on October 3, 2016 (A.R. 10694-99), and the mining plan modification was again approved.

The instant lawsuit is Plaintiffs' challenge to the updated EA and FONSI.

## II.   Legal Standards

### A.   NEPA Standard of Review

NEPA is a procedural statute enacted to protect the environment by requiring government agencies to meet certain procedural safeguards before taking action affecting the environment. *See Cal. Ex. rel. Lockyer v. US. Dept. of Agric.,* 575 F.3d 999, 1012 (9th Cir. 2009). In other words, NEPA "force[s] agencies to publicly consider the environmental impacts of their actions before going

forward." *Idaho Sporting Cong., Inc. v. Rittenhouse,* 305 F.3d 957, 963 (9th Cir. 2002).

NEPA requires an agency proposing a major federal action significantly impacting the environment to prepare an environmental impact statement ("EIS") to analyze potential impacts and alternatives.  42 U.S.C. § 4332(C).  To determine whether an EIS is required, the agency typically first prepares an EA.  40 C.F.R. § 1501.4(b).  An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. §§ 1508.9(a), (b); *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  5 U.S.C. § 706(2)(A).  Judicial review of administrative agency decisions under the APA is based on the administrative record compiled by the agency – not on independent fact-finding by the district court.  *Camp v. Pitts,* 411 U.S. 138, 142 (1973).

In reviewing an agency action under the APA, the Court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "Normally, an agency rule

4

would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Id.* Review is highly deferential to the agency's expertise, and presumes the agency action to be valid. *Arkansas v. Oklahoma,* 503 U.S. 91, 112 (1992). The agency, however, must articulate a rational connection between the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Id.*; *see also Midwater Trawlers Co-op v. Dep't of Commerce,* 282 F.3d 710, 716 (9th Cir. 2002). Thus, the reviewing court must look at whether the decision considered all of the relevant factors or whether the decision was a clear error of judgment. *Id.*

A court's review under NEPA is limited to whether the agency "took a 'hard look' at the environmental impacts of a proposed action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). A "hard look" under NEPA requires consideration of all foreseeable direct and indirect impacts. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957,

5

973 (9th Cir. 2002).  A hard look should involve a discussion of adverse impacts that does not improperly minimize negative side effects.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005).  "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Conservation Cong. v. Finely*, 774 F.3d 611, 621 (9th Cir. 2014).  Once the court is "satisfied that a proposing agency has taken a hard look at a decision's environmental consequences, [its] review is at an end."  *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992).

### B.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id*.

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the

6

opposing party will have the burden of proof at trial, the moving party need only point to an absence of evidence to support the nonmoving party's case.  *Id.*  Courts may resolve APA challenges via summary judgment.  *See Nw. Motorcycle Ass'n v. United States Dep't Agric.,* 18 F.3d 1468, 1472 (9th Cir. 1994).

## III.   Discussion

### A.      Standing

Plaintiffs assert they have standing based on the standing of their members, Jeremy Nichols, a WildEarth member, and Steve Gilbert, a MEIC member. Defendants do not challenge WildEarth's standing to bring this action.  But Defendants argue MEIC lacks standing because it has not demonstrated actual or imminent injury that threatens the interests of its members.  Defendants contend Mr. Gilbert's declaration is insufficient to establish standing because it fails to show he uses the affected area, and that his allegations of injury are insufficient.

An organization has standing to sue when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Individual members would have standing to sue in their own right if they have (1) "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

7

action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180-81 (2000) (*citing Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)). "Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, 'the causation and redressability requirements are relaxed.'" *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (*citing W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)).

The Court finds MEIC has demonstrated sufficient injury to establish standing. An environmental plaintiff "adequately allege[s] injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183. Here, Mr. Gilbert attests that he has long visited and recreated "in the area immediately surrounding the Spring Creek Mine." (Doc. 38-2 at ¶ 9.) Specifically, Mr. Gilbert states that he has visited areas to the south (CX Ranch), to the north (Rosebud Battlefield) and to the east (Tongue River Reservoir) of the mine. (*Id.* at ¶¶ 10-12.) Defendants contend these areas are too far away from the mine to demonstrate use of the affected area. Defendants point out the battlefield is 7 miles away and the reservoir is 4 miles away.

An environmental plaintiff cannot establish standing by merely offering "averments which state only that one of [the organization's] members uses

8

unspecified portions of an immense tract of territory, on some portion of which mining activity has occurred or probably will occur by virtue of the governmental action." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990). Nevertheless, a plaintiff "need not physically enter the affected area to establish an injury in fact." *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001). Proximity to the site on which the challenged activity is occurring can be sufficient. In *Laidlaw*, for example, the Supreme Court found the plaintiff had standing where its members lived 20 miles and recreated up to 40 miles away from the facility at issue. *Laidlaw*, 528 U.S. at 181-83. *See also Sierra Club v. Franklin Cty. Power of Ill.*, 546 F.3d 918, 925 (7th Cir. 2008) (finding standing based on member who recreated 3 miles from a proposed power plant); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1148 (9th Cir. 2000) (noting the injury in fact requirement in environmental cases is not "reducible to inflexible, judicially mandated time or distance guidelines").

This case is easily distinguishable from *Nat'l Wildlife Federation*, where the plaintiff was asserting standing based on unspecified use of an area of land that consisted of 5.5 million acres. *Nat'l Wildlife Fed.*, 479 U.S. at 877. Nor is it like *Lujan v. Def. of Wildlife*, 504 U.S. 555 (1992), where the plaintiffs sought to rely on an "eco-system nexus" theory of standing. There, the Supreme Court rejected the proposition that "any person who uses *any part* of a 'contiguous ecosystem' adversely affected by a funded activity has standing even if the activity is located a

9

great distance away." *Def. of Wildlife*, 504 U.S. at 565.  Here, Mr. Gilbert avers to using specific areas that are within 4 to 7 miles of the mine.  He further indicates that he has seen the mine and observes coal trains leaving the mine.  (Doc. 38-2 at ¶¶ 9, 13-15.)  The Court finds Mr. Gilbert's declaration demonstrates an adequate nexus to the affected area to show injury in fact.

Defendants also fault Mr. Gilbert's declaration for not stating a concrete plan to return to the affected area.  Vague assertions of a desire to return to an area or "some day" intentions, without "any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Defenders of Wildlife*, 504 U.S. at 564 (emphasis in original).  But "[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *Ecological Rights Found.*, 230 F.3d at 1149.

Mr. Gilbert's declaration explains that he is an avid outdoorsman and has made annual visits to the area surrounding the Spring Creek Mine to hunt, fish and otherwise recreate since 1977.  (Doc. 38-2 at ¶ 11-13.)  He further states he plans to continue his yearly hunting and fishing traditions.  He states he has "annually hunted upland birds" on the Rosebud Battlefield, and plans "to continue this annual tradition into the foreseeable future for as long as I am able."  (*Id.* at ¶ 11.) Likewise he says "I plan to continue fishing and canoeing in the Tongue River and

Tongue River Reservoir into the foreseeable future as long as I am able." (*Id.* at ¶ 12.)  He also specifically stated his intention to "visit the upper Tongue River country this spring as I do every spring, to hunt turkeys on beautiful public ponderosa pine grasslands near the Spring Creek Mine."  (*Id.* at ¶ 13.)  The Court finds Mr. Gilbert has stated a sufficiently concreate and credible allegation of future use.

Next, Defendants argue Mr. Gilbert's allegations of harm are insufficient. Harm that "affects the recreational or even the mere esthetic interests of the plaintiff" will suffice to support standing in an environmental case.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).  The claimed injury need not be substantial, an "identifiable trifle" will suffice.  *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n.14 (1973) ("an identifiable trifle is enough for standing to fight out a question of principle"); s*ee also American Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011) (finding diminution in pleasure associated with bird and wildlife watching was enough to confer standing).  Mr. Gilbert avers that his enjoyment of hunting and fishing in the area surrounding the Mine is compromised by his concerns about the environmental impacts of the mining operations and his observations of the coal trains in the area.[1]  (Doc. 38-2 at ¶¶ 11,

---

[1] In a supplemental declaration, Mr. Gilbert further states that he would like to hunt on the divide between Monument Creek and Spring Creek and to recreate more

13-16.)  Given that "aesthetic perceptions are necessarily personal and subjective," *Ecological Rights Found.*, 230 F.3d at 1150, the Court finds Mr. Gilbert has expressed a sufficient injury-in-fact for standing.

Finally, Defendants argue another mine, the Decker Mine, lies between the Tongue River Reservoir and Spring Creek Mine, and thus imply the Decker Mine more immediately harms Mr. Gilbert's aesthetic and recreational interests.  Even so, "the mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury.  So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple cases of the plaintiff's injury."  *WildEarth Guardians*, 795 F.3d at 1157.  Accordingly, the Court finds MEIC has standing because Mr. Gilbert's declaration adequately demonstrates his personal stake in this controversy.

---

often on the Tongue River Reservoir, but the view of the mine and coal trains dissuades him.  (Doc. 64-1 at ¶¶ 5.)  This also constitutes injury-in-fact. *See Laidlaw*, 528 U.S. at 183 (finding standing based on affiants' statement that they refrained from using a river for recreational purposes because of concerns about pollution); *Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004) (stating the "inability to unreservedly use public land suffices as injury-in-fact").  Defendants contend the Court should not consider the supplemental declaration.  Even without the additional averments, however, the Court finds Mr. Gilbert has identified sufficient harm.

### B.    Res Judicata

Next, Defendants argue WildEarth's claims are barred by res judicata.  "An action is barred under res judicata where (1) the prior litigation involved the same parties or their privies, (2) the prior litigation was terminated by a final judgment on the merits, and (3) the prior litigation involved the same 'claim' or 'cause of action' as the later suit."  *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 888 (9th Cir. 2000).

As discussed previously, this case follows *WildEarth I*, wherein WildEarth challenged an earlier approval of the mining plan modification for the Spring Creek Mine.  *WildEarth I* resulted in the Court's determination that Federal Defendants violated NEPA's public notice and hard look requirements.  *WildEarth I*, 2016 WL 259285 (Jan. 21, 2016).  The Court, therefore, ordered Federal Defendants to correct the NEPA violations by preparing an updated EA that took a hard look at the direct and indirect environmental effects of the mining plan modification, and by complying with the applicable public notice and participation requirements.  *Id*.

Defendants assert Plaintiffs now raise four new arguments concerning transportation impacts, piecemealing of NEPA analysis, failure to apply the social cost of carbon protocol in examining greenhouse gas effects, and *ultra vires* conduct that were not advanced in the prior litigation, but could have been. Defendants, therefore, urge the Court to find res judicata bars these claims.

13

Defendants' argument is premised on their contention that MEIC lacks standing. The Court has determined, however, that MEIC has standing. Thus, there is no identity of parties because MEIC was not a party to the prior litigation. Accordingly, regardless of whether WildEarth could or should have raised the four new claims in the prior litigation, MEIC's claims are not barred by res judicata.

## C.    Whether the EA Satisfies NEPA's "Hard Look" Requirements

Plaintiffs argue Federal Defendants failed to fully comply with NEPA because they failed to take a "hard look" at (1) the indirect and cumulative impacts of coal transportation; (2) the non-greenhouse gas effects of coal combustion; and (3) the greenhouse gas effects of coal combustion. Federal Defendants contend OSM adequately considered these impacts. Spring Creek asserts OSM had no obligation to consider transportation impacts in its NEPA analysis, and that OSM took a requisite "hard look" at the non-greenhouse gas and greenhouse gas effects.

A "hard look" under NEPA requires consideration of all foreseeable direct and indirect effects, and the likely cumulative impact of the agency action. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002); 40 C.F.R. § 1502.16, 1508.7, 1508.8. Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. They may include "related effects on air and water and other natural systems, including ecosystems." *Id.* A cumulative impact "is the impact on the environment which results from the incremental impact of the

14

action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency . . . or person undertakes such other actions." 40 C.F.R.

§ 1508.7.  Cumulative impacts may be the result of "individually minor but

collectively significant actions" that take place "over a period of time." *Id.*  A hard

look should involve a discussion of adverse impacts that does not improperly

minimize negative side effects. *Native Ecosystems Council v. U.S. Forest Serv.*,

428 F.3d 1233, 1241 (9th Cir. 2005).

### a.  Coal Transportation[2]

Plaintiffs first allege the Federal Defendants failed to take a hard look at the

indirect effects of coal transportation.  As an initial matter, the Court is not

persuaded by Spring Creek's argument that under *Dep't of Transp. v. Public

Citizen*, 541 U.S. 752 (2004), OSM did not have to consider the indirect and

cumulative effects of coal transportation.[3]  Essentially, Spring Creek suggests

OSM was required to approve the mining plan modification because the coal had

been leased to Spring Creek.  This is not the law.

In *Public Citizen*, the Supreme Court held agencies do not have to consider

effects if they have no statutory authority to act on the information.  *Public Citizen*,

---

[2] Despite Spring Creek's argument to the contrary, the Court finds Plaintiffs are not
precluded from raising this issue because WildEarth adequately apprised the
agencies of its concerns with coal trains during the public comment period.  (*See*
A.R. 17291-17292; 18257.)

[3] The Court notes that Federal Defendants do not argue they lacked authority to
consider effects of coal transportation under *Public Citizen*.

541 U.S. at 770.  *Public Citizen* involved the Federal Motor Carrier Safety Administration's development of safety standards for Mexican trucks operating in the United States.  The Supreme Court determined the agency did not have to consider the environmental effects of cross-border operations of Mexican trucks in its EA because the agency did not have the ability to prevent those operations, it only had power to set safety rules for the trucks.  *Id.* at 768-70.  But as federal appellate courts have subsequently explained, if an agency has statutory authority to act, the rule from *Public Citizen* does not apply.  *See Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) (holding where the FERC had authority to deny natural gas pipeline certificates, *Public Citizen* did not excuse it from considering the indirect environmental effects of pipelines it approves); *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213 (9th Cir. 2008) (rejecting argument that the NHTSA did not have to consider the environmental effect of a rule setting fuel economy standards under *Public Citizen* because the NHTSA had authority to impose or enforce fuel economy standards, and could have set higher standards if warranted by an EIS); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 105 (D.D.C. 2006) ("The holding in *Public Citizen* extends only to those situations where an agency has 'no ability' because of lack of 'statutory authority' to address the impact.").

In the present situation, OSM has authority to recommend approval, disapproval or conditional approval of mining plans based on "[i]nformation

16

prepared in compliance with [NEPA]."  30 C.F.R. § 746.13(b).  *See also* 30 C.F.R.

§ 746.14; 30 U.S.C. § 207(c).  Therefore, *Public Citizen* does not constrain OSM

from considering the indirect effects of approving the mining plan modification,

including coal transportation.  The question then turns to whether Federal

Defendants took a requisite "hard look" at the effects of coal transportation.

      "Agencies must consider only those indirect effects that are reasonably

foreseeable.  They need not consider potential effects that are highly speculative or

indefinite."  *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir.

1998).  Nevertheless, "[r]easonable forecasting and speculation is . . . implicit in

NEPA."  *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975).  *See also*

*Col. River Indian Tribes v. Marsh*, 605 F.Supp. 1425, 1434 (C.D. Cal. 1985)

(cautioning "an agency should not attempt to travel the easy path and hastily label

the impact of the [action] as too speculative and not worthy of agency review.").

      This case is strikingly similar to *Mont. Envtl. Info. Ctr. v. U.S. Office of*

*Surface Mining (MEIC)*, 274 F.Supp.3d 1074 (D. Mont. 2017).  In *MEIC*, the court

held OSM failed to take a hard look at the indirect and cumulative effects of coal

transportation.  *Id.* at 1081.  As in this case, a mining company, operating under a

federal coal lease, sought approval of a mining plan modification to expand its

mining operation.  Also, like here, the extracted coal was transported away from

the mine by rail.  *Id.* at 1083.  In *MEIC*, a 35-mile spur line connected the mine to

the BNSF mainline track.  *Id.*  Similarly, a spur line connects the Spring Creek

Mine to the mainline.  (A.R. 10726.)

In *MEIC*, OSM had restricted its analysis of the coal trains to the 35-mile spur line.  The court found this was insufficient.  *MEIC*, 274 F.Supp.3d at 1092-93. The court noted that the majority of the destinations for the coal, as well as the rail routes and estimates of the amount of coal to be sold to various customers, were known.  *Id.* at 1092.  Further, the court pointed out that OSM used that information to calculate greenhouse gas emissions likely to occur from coal transportation.  *Id.* The court therefore determined coal transportation is a foreseeable indirect effect of mining that must be analyzed under NEPA.  *Id.* at 1093.  The court concluded OSM unreasonably limited the scope of its analysis by failing to consider indirect or cumulative effects of coal transportation beyond the spur line.  *Id.*

The same is true in this case.  As in MEIC, the shipping destinations, rail routes, and coal plants receiving coal from the Spring Creek Mine are known. (A.R. 10724; 10725; 10808; 15459; 17287; 18732.)  Like *MEIC*, OSM used its knowledge of destinations and routes to calculate greenhouse gas emissions from coal trains.  (A.R. 10751.)  But further like *MEIC*, OSM did not consider transportation impacts beyond the area at or near the mine.  (A.R. 10744, 10779, 17488 (discussing air quality impacts in the vicinity of the mine); 10799-10800 (wildlife impacts in the area of the mine); 10808-10809 (discussing traffic impacts 4 miles south of the mine); 17457-17458, 17488 (noise).

Defendants make no effort to distinguish *MEIC*.[4]  The Court considers the analysis in *MEIC* instructive and persuasive.  Consistent with the analysis in MEIC, the Court finds "a reasonable degree of foreseeability exists," such that it would not be highly speculative to analyze the indirect and cumulative impacts caused by coal trains beyond the area near the mine.  *MEIC*, 274 F.Supp.3d at 1093.  Therefore, the Court finds OSM failed to take a "hard look" at impacts from coal transportation.

### b.    Non-Greenhouse Gas Emissions

Next, Plaintiffs argue OSM failed to take a "hard look" at non-greenhouse gas effects of coal combustion.  Plaintiffs note that OSM tallied projected pollution from coal combustion.  But Plaintiffs argue this is insufficient because NEPA requires agencies to also evaluate the effects of the pollution on human and environmental health.  *Ctr. for Bio. Diversity*, 538 F.3d at 1216.  Plaintiffs further argue that OSM arbitrarily dismissed the pollution as minor by only evaluating the emissions as a percentage of the national pollution totals, thereby diluting the significance of its local adverse environmental effects.  Defendants counter that they reasonably relied on the National Ambient Air Quality Standards ("NAAQS") to conclude that anticipated emission levels of pollutants from the mine and related activities were not significant because they did not exceed the NAAQS.

---

[4] Spring Creek merely expresses in a footnote its opinion that *MEIC* was erroneously decided.  Federal Defendants do not address *MEIC* at all.

In *MEIC*, the court noted that non-greenhouse gas pollution is "an important aspect of the problem [the agencies] are required to consider."  *MEIC*, 274 F.Supp.3d at 1094.  Recently, this district also held NEPA required agencies to consider the environmental consequences of downstream coal combustion where the projected quantity of recoverable coal was known, and the coal was expected to be burned to generate electricity.  *See W. Org. of Res. Councils v. BLM*, 2018 WL 1475470, *13 (D. Mont. March 26, 2018).  Further, under NEPA, agencies must do more than quantify pollution – they must also "discuss the *actual* environmental effects resulting from those emissions."  *Ctr. for Bio. Diversity*, 538 F.3d at 1216 (emphasis in original).  *See also Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 995 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is a necessary component of a cumulative effects analysis, but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres.")

In this case, OSM recognized that emissions from coal combustion impacts air quality.  (A.R. 10749.)  OSM was also aware of the projected quantity of coal to be mined, and that 95% of it was to be used to create electricity.  (A.R. 10752, 10775, 10780-81.)  As such, OSM was required by NEPA to consider the indirect effects of coal combustion.  *W. Org. of Res. Councils v. BLM*, 2018 WL 1475470 at *13.

/ / /

OSM noted that the mine and related activities are subject to state and federal air quality regulations, including the NAAQS. (A.R. 10740.) The NAAQS were established to protect public health and welfare, and set the maximum levels of air pollution allowed in the ambient air. (A.R. 10741.) The Clean Air Act established NAAQS for six pollutants, known as "criteria" pollutants, which "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." (*Id.*) Therefore, OSM identified levels of the criteria pollutants at and around the mine site. (A.R. 10744-49; 10775-80.) OSM then compared those levels to the NAAQS to assess the direct effects of the mine on air quality. (*Id.*)

Courts have upheld the use of the NAAQS for analyzing the *direct* effects of non-greenhouse gas pollutants on public health. *See W. Org. of Res. Councils v. BLM*, 2018 WL 1475470 at *16 (finding agencies did not act "arbitrarily and capriciously" by relying on the NAAQS to assess air quality within the planning area); *Border Power Plant Working Grp. v. DOE*, 260 F.Supp.2d 997, 1020-21 (S.D. Cal. 2010) (affirming use of the NAAQS to assess impacts of increased air pollutants at the U.S. Mexico border from Mexican power plants and proposed cross-border transmission lines).[5] As the Court in *Border Power Plant* explained, "[i]f ambient air quality standards are designed, as they are, to protect human

---

[5] These cases do not, however, hold that comparing local emissions to the NAAQS is an adequate method to analyze downstream, indirect effects of coal combustion.

21

health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health." *Border Power*, 260 F.Supp.2d at 1021.

Thus, OSM adequately considered the mine's *direct* impacts on human and environmental health by relying on the NAAQS. But OSM did not compare emissions from downstream coal combustion to the NAAQS. As such, its reliance on the NAAQS simply does not address Plaintiffs' argument about consideration of the downstream, *indirect* effects of coal combustion. Indeed, the fact that local emissions from the mine site do not exceed the NAAQS says nothing about the indirect effects of downstream combustion. Therefore, to the extent Defendants argue OSM properly relied on the NAAQS to consider coal combustion, their argument fails.

OSM did estimate the amount of criteria pollutants that would be emitted when the mine's coal was burned for power generation. (A.R. 10749-50.) Then, OSM compared the estimated emission levels of the criteria pollutants to the national averages for the same pollutants. (A.R. 10781.) OSM concluded the emissions were not significant because they were less than 1% of the U.S. average. (*Id.*)

But by only comparing the estimated emissions to total U.S. emissions, OSM potentially diluted the adverse environmental effects of coal combustion at a local level. The Ninth Circuit has stated that when assessing the effects of an

22

agency action, the appropriate analysis must include consideration of both broad

scale and local impacts.  *Pac. Coast Fed. of Fisherman's Ass'ns v. Nat'l Marine*

*Fisheries Serv.*, 265 F.3d 1028, 1036-37 (9th Cir. 2001).  This is because utilizing

a broad scale analysis may marginalize the local impacts of the activity on the

environment.  *See also Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1129-

30 (9th Cir. 2007) (noting that averaging environmental effects based on a broad

scope can lead to misleading results).  Further, although courts have affirmed the

analytical approach of comparing emissions to nation-wide levels, they have done

so where the comparisons were made at both national and regional levels.  *See e.g.*

*WildEarth Guardians v. Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013) (finding

BLM's evaluation of greenhouse gas emissions "as a percentage of state—and

nation-wide emissions" was sufficient); *Mayo Found. v. Surface Transp. Bd.*, 472

F.3d 545, 555 (8th Cir. 2006) (holding modeling of emissions "on both national

and regional levels" was sufficient).

     Here, OSM relied solely on a broad scale national comparison.  The Court

finds this was insufficient.  The Court further finds Defendants' argument that it

would be too speculative to consider regional or local effects of coal combustion is

undermined by the fact OSM was able to calculate greenhouse gas emissions on a

state level.  (*See* A.R. 10785 (noting that in 2014 approximately 86,000 tons of

coal from the mine were burned in Montana power plants, and estimating that the

coal from the mine that was burned in Montana power plants accounted for over

80,000 tons of greenhouse gas).)

Because OSM only tallied estimated emissions but did not adequately discuss the effects of downstream coal combustion, the Court finds OSM failed to take a "hard look" at the non-greenhouse gas effects of coal combustion.

### c.     Greenhouse Gas Emissions

Third, Plaintiffs assert OSM failed to take a "hard look" at the costs of greenhouse gas emissions.  Plaintiffs argue OSM improperly inflated the benefits of the proposed action, while failing to account for its costs, even though a tool was available to do so.  Specifically, Plaintiffs argue OSM should have used the Social Cost of Carbon Protocol ("SCC Protocol") to quantify the economic costs of greenhouse gas emissions.  Defendants counter that cost-benefit analyses are not required by NEPA, and that OSM's choice of methodology is entitled to deference.

The SCC Protocol is a tool that was developed by a federal interagency working group for "use in cost-benefit analyses for proposed regulations that could impact cumulative global GHG emissions."  (A.R. 10786.)  The Protocol "attempts to value in dollars the long-term harm done by each ton of carbon emitted."  *Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1375 (D.C. Cir. 2017).

Although the SCC Protocol was developed to assist in cost-benefit analysis in agency rulemaking, federal courts have discussed its application in several NEPA actions.  The parties cite several of these seemingly contradictory cases in support of their arguments.  Putting these cases into context, however, reveals that

the case law is not as inconsistent as it appears at first blush.  The cases relied on by the parties generally fall into two categories – cases discussing whether an agency sufficiently disclosed impacts of greenhouse gas ("consideration of effects cases"), and cases discussing the adequacy of an agency's cost-benefit analysis as it relates to greenhouse gas ("cost-benefit" cases).

Under the consideration of effects cases, courts have recognized that agencies are required to take a hard look at impacts from greenhouse gas emissions.  *See W. Org. of Res. Councils v. BLM (WORC)*, 2018 WL 1475470 (D. Mont. Mar. 26, 2018); *WildEarth Guardians v. Jewell*, 2017 WL 3442922 (D. N.M. Feb. 16, 2017); *WildEarth Guardians v. BLM*, 8 F.Supp.3d 17 (D.C. Cir. 2014).  But agencies are not required to use the SCC Protocol to do so.  For example, in *Jewell*, the court held OSM satisfied its obligation to consider greenhouse gas effects by using the predicted volume of greenhouse gas emissions as a proxy for assessing potential climate change impacts.  *Jewell*, 2017 WL 3442922 at *12.  *See also WORC*, 2018 WL 1475470 at *14 (holding BLM was not required to use the SCC Protocol to measure the effects of greenhouse gas; BLM's use of the proxy method was reasonable).  Under the proxy methodology, expected greenhouse gas emissions are calculated and then analyzed as a percentage of national or global emission levels.  *Jewell*, 2017 WL 3442922 at *12; *WORC*, 2018 WL 1475470 at *14; *WildEarth*, 8 F.Supp.3d at 35.  The proxy method is recommended by the Council on Environmental Quality's Final

Guidance for Federal Departments and Agencies on Consideration of Greenhouse

Gas Emissions and the Effects of Climate Change in National Environmental

Policy Act Reviews.  81 Fed. Reg. 51866-01 (recommending "that agencies use

projected GHG emissions as a proxy for assessing potential climate change effects

when preparing a NEPA analysis for a proposed agency action").  Accordingly,

under the consideration of effects cases, it is generally reasonable for an agency to

use the proxy methodology as a means to disclose greenhouse gas impacts.

In contrast, in the cost-benefits cases, courts have addressed the situation

where an agency not only discussed the effects of greenhouse gas, but then also

undertook a cost-benefit analysis.  Specifically, these cases looked at the

sufficiency of the agencies' assessment of the costs portion of their cost-benefit

analysis.  *See MEIC*, 274 F.Supp.3d at 1094-99; *High Country Conservation*

*Advocates v. U.S. Forest Serv.*, 52 F.Supp.3d 1174, 1189-93 (D. Colo. 2014).  Both

of these cases recognized that NEPA does not require a cost-benefit analysis.

*MEIC*, 274 F.Supp.3d at 1095; *High Country*, 52 F.Supp.3d at 1191; *see also* 40

C.F.R. § 1502.23.  But if an agency elects to quantify the benefits of a proposed

action, it must also quantify the costs.  *MEIC*, 274 F.Supp.3d at 1097-99; *High*

*Country*, 52 F.Supp.3d at 1191.  This is because it is improper for an agency to

place its "thumb on the scale by inflating the benefits of the action while

minimizing its impacts."  *MEIC*, 274 F.Supp.3d at 1098.  *See also Ctr. for Bio.*

*Div.*, 538 F.3d at 1198.  The SCC Protocol is a tool agencies can use to quantify

26

costs associated with greenhouse gas emissions. *High Country*, 52 F.Supp.3d at 1190.

In the present case, OSM used the proxy methodology to discuss the effects of greenhouse gas emissions. (A.R. 10751-52; 10782-87.) But OSM also quantified the socioeconomic benefits of the proposed mine expansion. (A.R. 10810-11; 17459-62; 17488-89.) In doing so, however, OSM did not quantify the costs associated with greenhouse gas emissions. Plaintiffs argue this aspect of OSM's analysis was arbitrary.

In order to determine if OSM acted arbitrarily, it is important to understand what is not at issue. Plaintiffs do not argue that OSM's disclosure of greenhouse gas effects was insufficient. If that was the extent of Plaintiff's argument, Defendants would prevail. Because, as noted, the use of the proxy methodology is sufficient for considering impacts related to greenhouse gas emissions. *WORC*, 2018 WL 1475470 at *14; *Jewell*, 2017 WL 3442922 at *12. But that is not Plaintiffs' contention here, which distinguishes this case from *WORC* and *Jewell*. Rather, Plaintiffs argue that because OSM quantified the benefits of the mine expansion, it was required to quantify the costs.

The Court agrees. Because OSM quantified the benefits of the proposed action, it must also quantify the associated costs or offer non-arbitrary reasons for its decision not to. The question before this Court, then, is whether OSM's decision not to use the SCC Protocol was reasonable. *See High Country*, 52

F.Supp.3d at 1191-92 ("The agencies, of course, might have been able to offer non-arbitrary reasons why the protocol should not have been included in the FEIS. They did not.").  Plaintiffs argue OSM's reasons for omitting the costs portion of its analysis lack merit.

The Court finds the reasons OSM gave in the EA for not using the SCC Protocol are arbitrary.[6]  First, OSM stated that "there is no consensus on the appropriate fraction of social cost of carbon tied to electricity generation that should be assigned to the coal producer."  (A.R. 10786.)  The Court finds this is not a persuasive justification because it misapprehends NEPA's mandate.  Under NEPA, agencies are not required to apportion responsibility for the impacts assessed, but rather, they must consider all reasonably foreseeable direct, indirect and cumulative impacts of a proposed action.  *Rittenhouse*, 305 F.3d at 973; 40 C.F.R. § 1502.16, 1508.7, 1508.8.

Second, OSM stated it elected not to use the SCC Protocol on grounds that it was uncertain whether greenhouse gas emissions would actually be reduced if the coal associated with the proposed plan was not mined because power plants have alternative sources for coal.  (A.R. 10786.)  Again, the Court finds *MEIC* instructive.  In *MEIC*, the court found OSM failed to take a hard look at

---

[6] The Court will only discuss the reasons OSM provided in the EA for not using the SCC Protocol because "post-hac rationalizations . . . are irrelevant to the question of whether the agencies complied with NEPA at the time they made their respective decisions."  *High Country*, 52 F.Supp.3d at 1192.

greenhouse gas emissions when, like here, it adopted a quantitative analysis of the

benefits of a proposed mine expansion, but did not quantify the associated costs.

*MEIC*, 274 F.Supp.3d at 1098.   To justify the omission, OSM asserted a similar

substitution argument.  *Id.*  The court rejected the analysis, stating it "is illogical,

and places the Enforcement Office's thumb on the scale by inflating the benefits of

the action while minimizing its impacts."  *Id.*  The Tenth Circuit likewise rejected

a "perfect substitution" assumption in *WildEarth Guardians v. BLM*, 870 F.3d

1222, 1236 (10th Cir. 2017).  There, the Court noted the BLM did not support its

substitution assumption with any data, and concluded it was "arbitrary and

capricious because the assumption itself is irrational (i.e., contrary to basic supply

and demand principles)."  *Id.*  The same is true here.  OSM's alternative source

substitution assumption is not supported by any market data, even though

modeling systems exist to evaluate market effects of changes in coal supply.  (*See*

A.R. 17214.)  Therefore, OSM's unsupported substitution assertion is arbitrary.

Finally, OSM cited unspecified "uncertainties associated with assigning a

specific and accurate social cost of carbon to the Proposed Action" as grounds for

not using the SCC Protocol.  (A.R. 10786-87.)  To the extent the uncertainties

OSM cite refer to the fact the Protocol is expressed in a range of values, this is not

a valid reason to not quantify the costs of greenhouse gas emissions.  *See High*

*Country*, 52 F.Supp.3d at 1192 (noting that although there is a wide range of

estimates about the social cost of greenhouse gas emissions, it was arbitrary for the

29

agencies to decide not to quantify the costs at all because the "agencies effectively zeroed out the cost"); *Ctr. for Bio. Div.*, 538 F.3d at 1200 (rejecting uncertainty argument as arbitrary and capricious because "while the record shows that there is a range of values, the value of carbon emissions reduction is certainly not zero"). OSM also stated that in order to provide any meaningful insight, the broader benefits of coal production would have to be considered.  (A.R. 10786.)  This reason is not persuasive because it disregards the fact OSM did in fact attempt to quantify benefits of the proposed action.  (A.R. 10810-11; 17459-62; 17488-89.)

Accordingly, the Court finds OSM failed to justify its failure to quantify the economic costs of greenhouse gas emissions.  As such, OSM failed to take a "hard look" at the costs of greenhouse gas emissions.[7]

### D.    Piecemealed Analysis

Plaintiffs argue OSM improperly segmented the Mine in order to evade preparation of a comprehensive EIS.  Plaintiffs contend OSM analyzed the proposed mining plan modification while ignoring Spring Creek's simultaneous

---

[7] Spring Creek argues the SCC Protocol has been withdrawn by executive order, and thus OSM cannot be directed to use it.  Regardless of administration policies that ebb and flow with the political tides, agencies must nevertheless comply with their obligation to properly quantify costs when they have touted economic benefits of a proposed action.  The Court's decision here does not mandate use of the SCC Protocol.  But it does require OSM to comply with NEPA by either quantifying the costs associated with greenhouse gas emissions or by reasonably justifying why that cannot be done.

proposal for another expansion involving 500 acres (referred to as the "TR1 expansion"). Plaintiffs assert that if the current proposal and the TR1 expansion were combined, the mine expansion would meet the presumptive threshold for an EIS under OSM guidelines. Plaintiffs argue OSM should, at a minimum, prepare an EIS considering both the current proposal and the TR1 expansion. Defendants contend Plaintiffs' argument ignores the statutory and regulatory framework that specifically allows for incremental expansion of existing coal mines. Spring Creek further argues the TR1 expansion was merely proposed and speculative, and therefore, OSM was not required to consider localized impacts from the TR1 permit area.

Plaintiffs are correct that, at times, "[a] single NEPA review document is required for distinct projects when there is a single proposal governing the projects or when the projects are connected, cumulative, or similar actions under the regulations implementing NEPA." *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1304 (9th Cir. 203) (*citing Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893-94 (9th Cir. 2002)). This is because an agency should be prevented from breaking an action "down into small component parts" to avoid significance. 40 C.F.R. § 1508.27(b)(7); *Earth Island*, 351 F.3d at 1305. Nevertheless, the Court does not find OSM has done so did here.

First, as Defendants point out, the Mineral Leasing Act contemplates incremental expansion of coal mines by providing a lease modification process.

31

*See* 30 U.S.C. § 203; 43 C.F.R. § 3432.2.  Therefore, this case does not involve an improper "gerrymandered series of permit applications."  *Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005).

Plaintiffs cite *Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975) in support of their argument that OSM improperly isolated the impacts of the incremental expansion from those of the larger, long-term mining operation.  But *Cady* is readily distinguishable from the present case.  *Cady* involved a 30,000-acre coal lease that had been approved by the Bureau of Indian Affairs without any environmental analysis.  *Id.* at 789.  The Ninth Circuit determined that an EIS was required for the 30,000-acre lease, and that an EIS related to a mining plan for only 770 acres of the leased land was not adequate to satisfy NEPA.  *Id.* at 793-95.  In contrast, here, the underlying lease was subject to environmental review.  (*See* A.R. 17390.)  Therefore, *Cady* does not compel a finding that OSM improperly piecemealed its analysis.

Second, NEPA only requires agencies to consider the cumulative impacts of reasonably foreseeable future actions.  36 C.F.R. § 220.3; 40 C.F.R. § 1508.7.  "[P]rojects need not be finalized before they are reasonably foreseeable," but "they must be more than merely 'contemplated.'"  *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014).  An agency is not required to consider every pending or proposed project because "projects in their infancy have uncertain futures."  *Jewell*, 738 F.3d at 310

(determining BLM was not required to consider cumulative impacts from eleven other pending coal lease applications in the Powder River Basin, finding they were not reasonably foreseeable because they were still undergoing NEPA analysis).

The Court finds the TR1 expansion was not reasonably foreseeable at the time the EA was issued. The process of mining federally-leased coal in Montana involves multiple steps. After leasing the coal, the mining operator must obtain (1) a surface mining permit from the Montana Department of Environmental Quality, and (2) the Secretary of the Interior's approval of a mining plan of operations under the Mineral Leasing Act. *MEIC*, 274 F.Supp.3d at 1082. The Secretary's decision to approve the mining plan is based on a recommendation from OSM. *Id.* "The legal process is not simplistic and it is designed not only to make mining opportunities available, but also to ensure the environment is protected by considerations of relevant issues and materials before a permit is issued or modified." *Id.* Here, at the time the EA was issued, the TR1 expansion was at the first step – Spring Creek had applied for a permit from the state. (A.R. 10769.) The Court declines to assume, as Plaintiffs do, that the pending application would be approved. *Jewell*, 738 F.3d at 310. Therefore, the Court finds the TR1 expansion was not reasonably foreseeable, such that OSM was required to analyze it in detail.

Finally, Plaintiff's contention that OSM ignored "ongoing mining on intertwined private and state land and pending proposals for mine expansions into

federal coal" is contradicted by the record.  The EA recognized the existence of the

TR1 proposal (A.R. 10769), noted Spring Creek was "currently recovering coal

under eight distinct coal leases" (A.R. 10723), discussed nearby coal mines (A.R.

10769, 10744), and noted the proposed mining "would be done in sequence with

mining other state and private coal leases."  (*See* A.R. 10735.)

Accordingly, the Court finds OSM did not improperly piecemeal its

analysis.

### E.    Decision Not to Prepare an EIS

Plaintiffs argue OSM's decision not to prepare an EIS was arbitrary and

capricious because there are substantial questions about whether the mine

expansion may cause significant impacts, and because OSM failed to follow its

own agency guidance.  Defendants counter that OSM's analysis of the impacts

from rail transportation, coal combustion, and greenhouse gas emissions was

adequate under NEPA, and thus sufficient to support its finding of no significant

impacts.  Therefore, Defendants assert the Court should defer to OSM's decision to

issue a FONSI instead of preparing an EIS.  Spring Creek further assert OSM's

internal guidelines are not binding, and in any event, did not require preparation of

an EIS.

Under NEPA, federal agencies are required to prepare an EIS for any "major

Federal actions significantly affecting the quality of the human environment."  42

U.S.C. § 4332(C).  "An EIS must be prepared if substantial questions are raised as

34

to whether a project may cause significant degradation of some human

environmental factor.  To trigger this requirement a plaintiff need not show that

significant effects will in fact occur, but raising substantial questions whether a

project may have a significant effect is sufficient."  *Ocean Advocates v. U.S. Army*

*Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) (internal quotations,

citations, brackets, and emphasis omitted).  Whether an action is significant is

addressed in terms of "context" and "intensity."  40 C.R.F. §1508.27.  Context

"means that the significance of an action must be analyzed in several contexts such

as society as a whole (human, national), the affected region, the affected interests,

and the locality."  40 C.F.R. § 1508.27(a).  Intensity "refers to the severity of

impact," and involves the consideration of ten factors.  40 C.F.R. § 1508.27(b).

Again, *MEIC* is instructive.  In *MEIC*, the Court found OSM failed to take a

hard look at the effects of coal transportation, non-greenhouse gas emissions, and

the cost of greenhouse gas emissions from coal combustion.  *MEIC*, 274 F.Supp.3d

at 1090-99.  The Court held that because OSM acted arbitrarily and capriciously by

failing to take a hard look at those impacts, the FONSI's evaluation of context and

intensity was arbitrary and capricious as well.  *Id.* at 1101, 1103.

Here, the Court has similarly determined OSM's analysis of impacts from

coal transportation, non-greenhouse gas effects of coal combustion, and the costs

of greenhouse gas emissions was insufficient.  Accordingly, as in *MEIC*, OSM's

finding of no significant impacts, and decision not to issue an EIS, was arbitrary

and capricious.

With regard to Plaintiffs' second argument, however, the Court finds this case is dissimilar to *MEIC* in a consequential way.  In the present case, Plaintiffs assert OSM failed to determine, under its internal guidelines, whether the proposed action was one normally requiring an EIS.  A similar argument was raised in *MEIC*.  *MEIC*, 274 F.Supp.3d at 1100.  But the court rejected the argument in MEIC because OSM had in fact specifically referenced its NEPA procedures in the FONSI.  *See id.* at 1100 ("The Enforcement Office stated in its FONSI that 'this EA follows the [Enforcement Office's] 516 DM 13, which is the departmental manual guiding the [Enforcement Office]'s implementation of the NEPA process.").  The court found that the reference in the FONSI "affirms that [OSM] followed its guidelines in preparing the Mining Plan."  *Id.* at 1101.  That is not the case here.  There is no mention of the guidelines in the FONSI.  (A.R. 10694-99.)

Although internal guidelines are not mandatory, when they indicate an EIS would normally be prepared, they create a presumption that the agency should prepare an EIS.  The Agency then bears the burden of establishing why that presumption should not apply in a particular case.  *Dine Citizens Against Ruining our Environment v. Klein*, 747 F.Supp.2d 1234, 1253 (D. Colo. 2010).  If the agency arbitrarily and capriciously fails to follow its own guidelines, its decision not to issue an ESI may be reversed.  *Davis v. Mineta*, 302 F.3d 1104, 1117 (10th Cir. 2002).

36

It appears the guidelines would normally have required an EIS in this case.

The guidelines provide:

> A.  The following OSM actions will normally require the preparation of an EIS:
> (4)   Approval of a proposed mining and reclamation plan for a surface mining operation that meets the following:
>
>> (a)   The environmental impacts of the proposed mining operation are not adequately analyzed in an earlier environmental document covering the specific leases or mining activity; and
>>
>> (b)   The area to be mined is 1280 acres or more, or the annual full production level is 5 million tons or more; and
>>
>> (c)   Mining and reclamation operations will occur for 15 years or more.

516 DM 13.4(A)(4).

Here, the Court previously determined the prior BLM EA for Federal Coal Lease MTM 94378 did not adequately address the impacts of the proposed mining plan modification. *WildEarth I*, 2016 WL 259285 at *2.  The mine expansion is expected to allow the mine's annual production level to continue at the current rate of 18 million tons per year (A.R. 10724; 10735), and mining and reclamation operations are projected to extend over 15 years (A.R. 17404) (showing mining cuts beginning in 2010 and ending in 2029).  Thus, OSM bears the burden of establishing why the presumption that an EIS normally should have been prepared does not apply.

/ / /

Federal Defendants have not addressed this issue.  Spring Creek asserts the first factor of the test is not satisfied.  However, Spring Creek's argument is contradicted by the Court's prior order in *WildEarth I*.  Accordingly, the Court finds OSM's apparent failure to consider its own guidelines was arbitrary.

The Court further finds Spring Creek's argument, that OSM did not have to prepare an EIS because doing so would have been impossible due to time constraints, is unavailing.  "Difficulty of compliance will not permit an agency to avoid its duties under NEPA."  *Seattle Audubon Soc'y v. Moseley*, 798 F.Supp. 1494, 1497 (W.D. Wash. 1992).  Moreover, the Court previously stated that Defendants could seek leave to extend the 240-day deadline upon a showing of good cause, which "would include . . . a decision to complete an Environmental Impact Statement."  *WildEarth I*, 2016 WL 259285 at *3.

Finally, Spring Creek's insinuation that this Court's prior order excused OSM from preparing an EIS is unpersuasive.  Nothing in the Court's prior order relieved OSM of its obligations to fully comply with NEPA, including preparing an EIS if warranted.

Accordingly, the Court finds OSM's decision not to prepare an EIS was arbitrary and capricious.

### F.     Validity of the Underlying Lease

Plaintiffs' final argument is that OSM failed to consider the validity of the underlying federal coal lease.  Plaintiffs assert the underling lease is invalid

38

because the BLM employee who authorized it lacked authority to do so.

Therefore, Plaintiffs claim there is a cloud over the underlying lease's validity,

which OSM had a duty to disclose to the Secretary in its recommendation for

approval of the mining plan modification.  Plaintiffs further argue that the

Secretary's approval of the mining plan modification was *ultra vires*.  Plaintiffs

contend the Secretary's authority to authorize a mining plan is tied to the existence

of leased federal coal, and since the underlying lease was invalid, there is no leased

federal coal, and consequently, the Secretary exceeded the scope of his authority.

Defendants counter that Plaintiffs' argument is essentially a collateral attack on the

underlying coal lease and is barred by statute of limitations.  Defendants further

note OSM did consider Plaintiffs' argument and rejected it.[8]

A six-year limitations period applies to NEPA and APA challenges.  28

U.S.C. § 2401(a); *Turtle Island Restoration Net. v. U.S. Dep't of Commerce*, 438

F.3d 937, 942-43 (9th Cir. 2006.)  To avoid this time bar, Plaintiffs strive to cast

this claim as identifying a flaw in the mining plan approval process, and not a

---

[8] Defendants also argue the lease itself was signed by an indisputably authorized official.  Therefore, Defendants contend even if the NEPA decision record and FONSI were signed by an unauthorized BLM official, the lease itself is not flawed because it was signed by the correct BLM official.  This argument, however, has been rejected by the Interior Board of Land Appeals ("IBLA").  In *WildEarth Guardians*, 189 IBLA 274 (I.B.L.A. Feb. 7, 2017) *available at* 2017 WL 604076, the IBLA explained that the decision record is "the authorizing document," and "once the decision is made to modify a coal lease through a [decision record], execution of the document implementing that decision is merely ministerial."  *Id.* at *281-82.

collateral attack on the underlying lease. But at its core, the claim is collateral in nature. Plaintiffs' *ultra vires* argument illustrates the point. Plaintiffs state that "[i]f the underling federal coal lease is invalid, then there is no 'leased federal coal,' which is the necessary predicate for any approval of a mining plan." (Doc. 38 at 35.) Thus, Plaintiffs seek to invalidate the Secretary's approval of the mining plan modification by impugning the validity of the lease.

The underlying federal coal lease was signed in November 2007. (A.R. 10995.) Therefore, the statute of limitations for any challenge to the validity of the lease expired in 2013. As such, the Court finds Plaintiffs' claim concerning the validity of the lease is time barred.

Even if Plaintiffs' claim is construed as timely, the Court nevertheless finds it lacks merit. OSM did consider Plaintiffs' argument concerning the lease, and rejected it. (A.R. 10920.) OSM correctly noted that it does not have authority to determine the validity of a federal coal lease. BLM is the responsible agency. *See* 30 C.F.R. § 740.4(d)(9). OSM also correctly noted that the leasing decision had not been declared invalid by an administrative or judicial tribunal. (A.R. 10920.) The Court finds OSM properly relied on the BLM's issuance of the lease,

particularly where the statute of limitations for any challenge to the leasing decision had expired years before the EA was issued.

The Court therefore finds OSM did not arbitrarily fail to consider the validity of the underlying coal lease.

### G.    Remedy

Having again found Federal Defendants in violation of NEPA, the Court must once again determine the appropriate remedy.  Plaintiffs argue the Court should vacate the EA, FONSI and mining plan approval, as well as enjoin further mining in the expansion area.  Spring Creek counters that neither vacatur nor an injunction are warranted.

Previously, this Court determined that vacatur "would have detrimental consequences for [Spring Creek] and its employees, for the State of Montana, and for other agencies involved in this process." *WildEarth I*, 2015 WL 6442724 at *9. The Court noted that not only would production at the mine be halted, but so would reclamation and remediation efforts. *Id.*  In addition, the Court stated that vacatur may result in duplication of efforts regarding the State permitting process, which appeared to be accomplished in a correct and thorough manner. *Id.* Therefore, the Court recommended that vacatur be deferred for a period of time to permit Federal Defendants to correct the NEPA deficiencies. *Id.*

The Court finds the reasoning previously articulated by this Court continues to be valid today.  Accordingly, the Court recommends that vacatur be deferred for

a period of 240 days from the date of a final order on the pending motions for

summary judgment.  During this time period, Federal Defendants should be

directed to correct the NEPA violations outlined above and prepare an updated EA.

If Federal Defendants determine an EIS should be completed, they may seek leave

to extend the deadline.

## IV.  Conclusion

Based on the foregoing, **IT IS RECOMMENDED** that:

1. Plaintiffs' Motion for Summary Judgment (Doc. 37) be **GRANTED in part** as set forth above;

2. Federal Defendants' Cross-Motion for Summary Judgment (Doc. 59) be **DENIED**; and

3. Defendant-Intervenor Spring Creek Coal LLC's Cross-Motion for Summary Judgment (Doc. 62) be **DENIED**.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court, and copies served on opposing counsel, within fourteen (14) days after entry hereof, or objection is waived.

DATED this 11th day of February, 2019.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge