William W. Mercer
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, MT 59103-0639
Telephone: (406) 896-4607
Facsimile: (406) 252-1669
Email: wwmercer@hollandhart.com

Kristina R. Van Bockern *(Pro Hac Vice)*
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8107
Facsimile: (720) 545-9952
Email: trvanbockern@hollandhart.com

Andrew C. Emrich (*Pro Hac Vice*)
HOLLAND & HART LLP
6380 South Fiddlers Green Cir., Suite 500
Greenwood Village, CO 80111
Telephone: (303) 290-1621
Facsimile: (866) 711-8046
Email: acemrich@hollandhart.com

*Attorneys for Defendant-Intervenor Spring Creek Coal LLC*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RYAN ZINKE, in his official capacity of Secretary of the Interior, *et al.*, <br><br> Defendants, <br><br> and <br><br> SPRING CREEK COAL LLC, <br><br> Defendant-Intervenor. | CV 17-80-BLG-SPW-TJC <br><br> **DEFENDANT-INTERVENOR SPRING CREEK COAL LLC'S OBJECTIONS TO MAGISTRATE CAVAN'S FINDINGS AND RECOMMENDATIONS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

GLOSSARY OF ABBREVIATIONS ..................................................... v

INTRODUCTION ............................................................................. 2

STANDARD OF REVIEW ................................................................. 6

I.    *De Novo* Review of Findings and Recommendations. ...................................... 6

II.   Standards Applicable to Review of NEPA and APA Cases. .......................... 6

ARGUMENT .................................................................................. 7

I.    The Magistrate Judge Erred in Finding that OSMRE Failed to Take a "Hard Look" at the Impacts of the Mining Plan Approval. ........................... 7

    A.    OSMRE Adequately Analyzed Rail Transportation Impacts. ............. 7

        1.    OSMRE Has No Ability to Prevent Rail Transportation Impacts. .................................................................. 8

        2.    OSMRE's Approval of the Spring Creek Mine Plan is Not the Legal Cause of Any Adverse Impacts Across Thousands of Miles of Rail. ..................................... 11

    B.    OSMRE Adequately Analyzed the Non-Greenhouse Gas Emission Impacts from Coal Combustion. ......................................... 16

    C.    OSMRE Did Not Undertake a Cost-Benefit Analysis and, Therefore, Was Not Required to Quantify the Cost of Greenhouse Gas Emission Impacts. ........................................ 20

II.   The Magistrate Judge Erred in Finding OSMRE's Decision to Issue a FONSI and Not Prepare an EIS Was Arbitrary and Capricious. ................. 23

III.  The Magistrate Judge Erred in Recommending Any Potential Vacatur of the Mining Plan. ........................................................... 26

CONCLUSION ................................................................................ 28

EXHIBIT LIST ............................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*Asarco, Inc. v. EPA*,
   616 F.2d 1153 (9th Cir. 1980) ...........................................................24

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983)................................................................3, 22

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
   2016 WL 4445770 (C.D. Cal. Aug. 12, 2016) ...........................................27, 28

*Big Bend Conservation All. v. FERC*,
   896 F.3d 418 (D.C. Cir. 2018)...................................................10, 11

*Cal. Cmtys. Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) ...........................................................27

*Ctr. for Biological Diversity v. BLM*,
   937 F. Supp. 2d 1140 (N.D. Cal. 2013)..............................................24

*Ctr. for Biological Diversity v. Skalski*,
   61 F. Supp. 3d 945 (E.D. Cal. 2014) ................................................24

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004)...........................................................passim

*EarthReports, Inc. v. FERC*,
   828 F.3d 949 (D.C. Cir. 2016).........................................................11

*Edwardsen v. U.S. Dep't of Interior*,
   268 F.3d 781 (9th Cir. 2001) ...........................................................25

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
   378 F.3d 1059 (9th Cir. 2004) .........................................................18

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ...........................................................27

*Mayo Found. v. Surface Transp. Bd.*,
   472 F.3d 545 (8th Cir. 2006) ...........................................................18

*MEIC v. OSMRE*,
    274 F. Supp. 3d 1074 (D. Mont. 2017)..........................................................passim

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983)..................................................................11, 12, 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..........................................................................10

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*,
    449 F.3d 1016 (9th Cir. 2006) ..........................................................22

*Save Our Cumberland Mountains v. Kempthorne*,
    453 F.3d 334 (6th Cir. 2006) ...........................................................18

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016) ...........................................................11

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ........................................................11

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013)..........................................................18

*WildEarth Guardians v. OSMRE*,
    2016 WL 259285 (D. Mont. Jan. 21, 2016) ......................................25

*WildEarth Guardians v. Zinke*,
    2019 WL 1273181 (D.D.C. Mar. 19, 2019) ...............................passim

*Yakutat, Inc. v. Gutierrez*,
    407 F.3d 1054 (9th Cir. 2005) .........................................................10

## STATUTES

5 U.S.C. § 706........................................................................................24

5 U.S.C. § 706(2)(A)..............................................................................7

28 U.S.C. § 636(b)(1).........................................................................1, 6

28 U.S.C. § 2401(a) .............................................................................26

30 U.S.C. § 201(a)(3)(C) ............................................................5, 9, 10, 21

30 U.S.C. § 1273(c) ...........................................................................................9, 10

## REGULATIONS

30 C.F.R. § 746.1 ....................................................................................................9

30 C.F.R. § 746.13 .............................................................................................9, 10

30 C.F.R. § 746.13(b) ...........................................................................................10

30 C.F.R. § 1206.257(b)(3) .....................................................................................9

40 C.F.R. § 1502.23 .........................................................................................5, 22

40 C.F.R. § 1508.8 ...........................................................................................5, 21

## OTHER AUTHORITIES

46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981)........................................................23

Local Rule 7.1(d)(2)................................................................................................31

Local Rule 72.3 ..................................................................................................1, 31

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | U.S. Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| DOI | Department of the Interior |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| MEIC | Montana Environmental Information Center |
| MLA | Mineral Leasing Act of 1920 |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| OSMRE | U.S. Office of Surface Mining Reclamation and Enforcement |
| OSM##### | Document pages in the Administrative Record, which have the prefix "OSM" |
| SCC | Social Cost of Carbon |
| Secretary | U.S. Secretary of the Interior |
| SMCRA | Surface Mining Control and Reclamation Act of 1977 |
| Spring Creek | Spring Creek Coal LLC |
| WildEarth | WildEarth Guardians |

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.3, Defendant-Intervenor Spring Creek Coal LLC ("Spring Creek") submits these Objections to the Findings and Recommendations of Magistrate Judge Timothy J. Cavan, issued February 11, 2019, granting in part Plaintiffs' motion for summary judgment (ECF 37) and denying Federal Defendants' and Defendant-Intervenor's cross-motions for summary judgment (ECF 59 and 62).  ECF 71.

Spring Creek objects to the Magistrate Judge's determination that Federal Defendants violated the National Environmental Policy Act's ("NEPA") "hard look" requirements when approving Spring Creek's 2016 mine plan modification, *id.* at 14-30, and that the Office of Surface Mining Reclamation and Enforcement's ("OSMRE") decision not to prepare an Environmental Impact Statement ("EIS") was arbitrary and capricious.  *Id.* at 34-38.  Spring Creek also objects to the Magistrate Judge's recommended remedy of any vacatur—including "deferred" vacatur—of Spring Creek's mine plan.  *Id.* at 41-42.

Spring Creek incorporates by reference Federal Defendants' objections to the Magistrate Judge's finding that Plaintiff Montana Environmental Information Center ("MEIC") has standing to pursue this action, *id.* at 12, and the Magistrate Judge's related finding that Plaintiffs' claims are not barred by res judicata.  *Id.* at 13-14.

Spring Creek supports the Magistrate Judge's findings that OSMRE did not improperly piecemeal its NEPA analysis, *id.* at 30-34, and that OSMRE did not arbitrarily fail to consider the validity of the underlying coal lease. *Id.* at 38-41.

Spring Creek does not have any objections to the Magistrate Judge's factual findings.

## INTRODUCTION

This case represents Plaintiff WildEarth Guardian's ("WildEarth") second challenge to OSMRE's decision to approve Spring Creek's mine plan. In response to WildEarth's first challenge, this Court held that OSMRE had failed to provide proper notice of the agency's mine plan approval decision. OSM10860. As a result, OSMRE was ordered to prepare an environmental assessment ("EA") to supplement the EA the Bureau of Land Management ("BLM") had previously prepared (with OSMRE as a cooperating agency) in 2006 prior to issuing the federal lease at issue, MTM-94378. OSMRE faithfully satisfied the Court's order and, in 2016, prepared a thorough EA that was commensurate in scope with OSMRE's legal authority in approving the mining plan for the Spring Creek Mine.

Unsurprisingly, WildEarth was not satisfied. Now joined by MEIC, who sat out the previous round of litigation, WildEarth raises issues in this case that could have been raised in its previous challenge. In sum, Plaintiffs now claim OSMRE's EA is not adequate and failed to take a "hard look" at the environmental impacts of

2

its actions because it does not analyze disparate environmental impacts thousands of miles from the Spring Creek Mine and over which OSMRE has no legal control. However, after thirteen years of public notice and comment, state and federal environmental reviews and permitting, and two rounds of litigation—representing almost 20,000 pages in the administrative record—it cannot be said that OSMRE failed to take a "hard look" at the environmental impacts of Spring Creek's mining plan. ECF 63 at 2-6. NEPA's "twin aims" of informing the public and the agency have been satisfied. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). OSMRE's mine plan decision and supporting NEPA analysis should be affirmed.

The Magistrate Judge's Findings and Recommendations should be rejected for five main reasons. First, OSMRE took a sufficiently "hard look" at the environmental impacts of rail transportation. *See* ECF 63 at 9-13; ECF 69 at 4-5. The Magistrate Judge faults OSMRE for analyzing the indirect impacts of rail transportation in the vicinity of the mine but not Plaintiffs' laundry list[1] of indirect impacts of transporting Spring Creek coal all across the United States to Spring Creek's end-users. ECF 71 at 18-19. The Magistrate Judge's recommendation goes well beyond the bounds of what is required by NEPA's indirect impacts analysis and OSMRE's statutory authority, requiring OSMRE to analyze impacts

---

[1] *See* ECF 38 at 6 (alleging that Federal Defendants should have analyzed transportation impacts such as diesel fumes, noise, vibrations, rail congestion, dust, derailments, impacts to protected species, water, and environmentally sensitive areas).

that they have "no ability" to act upon and to undertake an impossible task.  The Magistrate Judge's recommendation would require OSMRE to speculate about the potential impacts of transporting Spring Creek coal across thousands of miles of rail lines from the Mine to a variety of different states, which routes vary at any given time based on customer demands, weather, and rail traffic.  In addition, it cannot even be shown that any particular adverse impact along any of these routes is *caused* by the transportation of Spring Creek's coal because coal from other coal mines and countless other goods are also transported on the same rail lines.

Second, the Magistrate Judge's finding that OSMRE failed to take a "hard look" at the non-greenhouse gas effects of coal combustion at power plants across the United States, Asia, and Canada also fails to recognize NEPA's mandate.  ECF 71 at 22-24.  Specifically, the Magistrate Judge found that OSMRE's comparison of (a) the estimated amount of criteria pollutants that would be emitted by burning Spring Creek coal to (b) national averages for the same pollutants was insufficient. *Id.* at 22.  Instead, the Magistrate Judge appears to recommend that OSMRE be directed to evaluate combustion impacts at both the national and regional levels.  But because Spring Creek's coal is burned in different regions across the United States, Canada, and Asia alongside coal from countless other mines and under varying environmental permitting regimes, it is speculative for OSMRE to estimate the local non-greenhouse gas combustion impacts of burning Spring Creek coal at

localities around the world, including whether such combustion impacts exceed the regulatory emissions limits in each region.

Third, the Magistrate Judge erroneously found that OSMRE undertook a cost-benefit analysis and, in doing so, failed to employ the Social Cost of Carbon Protocol ("SCC Protocol") or some other method of quantifying the costs of combustion.  ECF 71 at 27.  But OSMRE did not undertake a cost-benefit analysis. Nor was it required to do so.  40 C.F.R. § 1502.23.  OSMRE merely complied with its obligation to analyze the socioeconomic impacts of its decision.  *See* 30 U.S.C. § 201(a)(3)(C); 40 C.F.R. § 1508.8.  The Magistrate Judge's mandate for OSMRE to undertake a cost-benefit analysis, using the SCC Protocol or any other methodology to quantify the impacts of coal combustion, unlawfully imposes an obligation on the agency to undertake a cost-benefit analysis that NEPA does not require.

Fourth, the Magistrate Judge erred in finding that OSMRE's decision not to prepare an EIS was arbitrary and capricious.  ECF 71 at 35-36, 38.  OSMRE properly found that the impacts of its mining plan approval were not significant and, therefore, its decision to issue a Finding of No Significant Impact ("FONSI") was supported by the EA.  Moreover, the Magistrate Judge's reliance on OSMRE's NEPA guidelines as a basis for requiring an EIS is misplaced because: (1) the guidelines are not mandatory; (2) OSMRE was not required to "mention" the

guidelines in its FONSI to comply with NEPA; and (3) the guidelines do not

indicate that an EIS was required.

Lastly, the Magistrate Judge erred in recommending any potential vacatur of

the mine plan pending additional NEPA analysis.  ECF 71 at 41-42.  OSMRE's

NEPA analysis was sufficient, but even if the Court finds that additional analysis is

necessary, *any* vacatur of the mining plan is unnecessary and would cause

significant harm to the Spring Creek Mine, its employees, the surrounding

communities, and the environment.  ECF 63 at 25-29; ECF 63-2.

## STANDARD OF REVIEW

I.   *De Novo* **Review of Findings and Recommendations.**

The Magistrate Judge's Findings and Recommendations are reviewed *de*

*novo.*  28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo

determination of those portions of the report or specified proposed findings or

recommendations to which objection is made.").  The Court may accept, reject, or

modify, in whole or in part, the findings or recommendations made by the

Magistrate Judge.  *Id.*  The Court may also receive further evidence or recommit

the matter to the Magistrate Judge with instructions.  *Id.*

II.  **Standards Applicable to Review of NEPA and APA Cases.**

The Magistrate Judge provides a detailed and accurate explanation of the

standard of review in NEPA cases.  ECF 71 at 3-6.  Under the Administrative

Procedure Act ("APA"), the court must determine whether OSMRE's action is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the APA is narrow and the reviewing court may not substitute its judgment for that of the agency. ECF 71 at 5 (citing cases). The court's review is highly deferential to the agency's expertise and presumes the agency's action to be valid. *Id.*

## ARGUMENT

**I.   The Magistrate Judge Erred in Finding that OSMRE Failed to Take a "Hard Look" at the Impacts of the Mining Plan Approval.**

**A.   OSMRE Adequately Analyzed Rail Transportation Impacts.**

The Magistrate Judge found that OSMRE failed to take a "hard look" at the impacts of rail transportation beyond the immediate vicinity of the mine. ECF 71 at 18-19. In so finding, the Magistrate Judge relied entirely upon the decision in *MEIC v. OSMRE,* 274 F. Supp. 3d 1074, 1093 (D. Mont. 2017), and found that there was "a reasonable degree of foreseeability" such that any analysis of the indirect impacts caused by coal trains beyond the area of the mine would not be "highly speculative." ECF 71 at 18-19. The Magistrate Judge's reliance on *MEIC* should be rejected.

As Spring Creek indicated in its briefing, the *MEIC* decision was wrongly decided because it failed to consider the U.S. Supreme Court's holding in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), which limits the scope of NEPA reviews. ECF 63 at 13 n.1. *Public Citizen* reiterated two very

important limitations on the scope of an agency's NEPA analysis: (1) "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, … the agency need not consider these effects" in its NEPA analysis (*id.* at 770); and (2) "NEPA requires a reasonably close causal relationship between the environmental effect and the alleged cause." *Id.* at 767 (internal quotation omitted).  The *MEIC* court disregarded these limitations.

In light of these limitations, OSMRE had no duty to consider rail transportation impacts in its NEPA analysis because, as discussed in detail below and in prior briefing: (1) OSMRE lacks the statutory and regulatory authority to prohibit or limit Spring Creek from transporting federal coal by rail; and (2) there is no close causal relationship between OSMRE's approval of Spring Creek's 2016 mine plan and rail transportation impacts because the rail routes vary greatly and coal from other mines (as well as countless other consumer goods) are also transported along the same rail lines.  The analysis of rail transportation impacts OSMRE did undertake was sufficient under NEPA's "hard look" requirement.

### 1. OSMRE Has No Ability to Prevent Rail Transportation Impacts.

As Spring Creek discussed in its summary judgment briefing, OSMRE's NEPA analysis was circumscribed by its statutory and regulatory authority.  ECF 63 at 11-13; ECF 69 at 4-5.  OSMRE's authority to approve, disapprove, or conditionally approve the mining plan (*see* 30 C.F.R. § 746.1) is derived from the

8

Mineral Leasing Act ("MLA") and the Surface Mining Control and Reclamation Act ("SMCRA"). *See* 30 U.S.C. § 201(a)(3)(C); 30 U.S.C. § 1273(c); 30 C.F.R. § 746.13. Those Acts establish the *factors* that OSMRE may consider in reviewing a mine plan; whether the mine plan will achieve maximum economic recovery of the coal and whether the mining operations comply with the performance standards established under SMCRA. *Id.*

The fact that OSMRE must comply with NEPA before approving a mine plan does not expand the reach of OSMRE's statutory and regulatory control such that it has the "ability to prevent" the transportation of coal on railroads across the United States. Indeed, any effort by OSMRE to restrict the transportation of coal (through a "condition" of the mine plan) would violate Spring Creek's regulatory and contractual rights, as well as its duty to market and sell the leased coal for the mutual benefit of Spring Creek and the government. *See* 30 C.F.R. § 1206.257(b)(3).

In a recent decision involving a NEPA challenge to BLM's oil and gas lease sale in Wyoming, the U.S. District Court for the District of Washington, D.C. recognized that under the DOI's regulatory framework (including parameters set forth in the MLA and the rights bestowed by the lease), the BLM lacks authority to preclude the development of leases after the leases are sold. *WildEarth Guardians v. Zinke*, 2019 WL 1273181, at *12 (D.D.C. Mar. 19, 2019). Similarly, OSMRE

lacks authority to preclude Spring Creek from developing its BLM-approved coal leases through denial of the mine plan.

The Magistrate Judge's rationale that, because a mine plan decision is based in part on "[i]nformation prepared in compliance with [NEPA]" (quoting 30 C.F.R. § 746.13(b)), OSMRE must be able to deny a mine plan based on *any* and *all* impacts identified during the NEPA process ignores the bounds of agency decision-making. *See* ECF 71 at 16-17. The U.S. Supreme Court and numerous lower court decisions have made clear that an agency violates the APA if it "relie[s] on factors which Congress has not intended it to consider" in its decision-making process. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also, e.g., Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1067-68 (9th Cir. 2005) (examining substantive statutory factors established by Congress). *See* 30 U.S.C. § 201(a)(3)(C); 30 U.S.C. § 1273(c); 30 C.F.R. § 746.13.

And NEPA cannot expand an agency's regulatory authority. On the contrary, *Public Citizen* and the numerous cases cited in Spring Creek's briefs (ECF 63 at 8-12; ECF 69 at 2-5) make clear that an agency's NEPA obligations are proportionate to, and *limited by*, the scope of authority given the agency by Congress. Here, in light of OSMRE's limited statutory and regulatory authority under the MLA and SMCRA, OSMRE had no obligation under NEPA to consider

rail transportation impacts along every transportation route to every end-user of the coal. *See Pub. Citizen*, 541 U.S. at 767 (agency's NEPA analysis circumscribed by "rule of reason"); *Big Bend Conservation All. v. FERC*, 896 F.3d 418, 419 (D.C. Cir. 2018) (rejecting claim for "expanded" NEPA review "regardless of the scope of [agency's] jurisdiction").

> ## 2.   OSMRE's Approval of the Spring Creek Mine Plan is Not the Legal Cause of Any Adverse Impacts Across Thousands of Miles of Rail.

Similarly, under *Public Citizen*, an agency is not required to examine everything for which the project could conceivably be a "but for" cause in order to satisfy NEPA.  541 U.S. at 767; *see also Sierra Club v. FERC*, 827 F.3d 36, 46 (D.C. Cir. 2016); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016); *Sierra Club v. FERC*, 867 F.3d 1357, 1372 (D.C. Cir. 2017).  The Court in *Public Citizen* explained: "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations."  541 U.S. at 767.  Instead, "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause."  *Id.* (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)).

The Supreme Court previously clarified in *Metropolitan Edison Co.* that, in the context of NEPA, "courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may

make an actor responsible for an effect and those that do not." *Metro. Edison Co.*, 460 U.S. at 774, n.7.  Where the causal relationship between the agency's action and the impacts is insufficient, under NEPA's "rule of reason," the agency is not "responsible under NEPA to consider the environmental effects." *Pub. Citizen,* 541 U.S. at 768.

Here, the causal relationship between OSMRE's decision to approve Spring Creek's mine plan for federal lease MTM-94378 and *any and all* identifiable adverse impacts to air and water, "environmentally sensitive areas," "endangered fish species," and other "protected species" along *every* rail line that transports Spring Creek coal is far too attenuated.  ECF 38 at 6; ECF 64 at 7.  Coal from the Spring Creek Mine is transported by rail to end-users all over the United States and Canada for ultimate use in the United States and Canada, and for export to Asian customers.  OSM10724; *see also* Exhibit A, Declaration of David Schwend in Support of Spring Creek's Objections ¶¶ 4-9. ("Schwend Decl.").

For example, over the past few years, Spring Creek has sold coal to domestic customers in a variety of states, including Washington, Arizona, Montana, Colorado, North Dakota, South Dakota, Minnesota, Michigan, and Alabama.  *Id.* ¶ 9.  Sales to these states varies from year to year based on changes in contracts with the customers in those states.  *Id.*  Also, over the past few years, Spring Creek has sold coal for export to Asian and Canadian customers.  *Id.* ¶¶ 4-6, 10.  Coal

12

exported to Asian utility customers is shipped by rail from the Spring Creek Mine to the Westshore Terminal in Vancouver, British Columbia, where it is loaded onto ships for transport overseas. *Id.* ¶ 6. Coal exported to Canadian utility customers is shipped directly to various Canadian provinces via rail. *Id.* ¶ 4.

In all instances where Spring Creek coal is transported by rail, the rail routes and rail segments can vary greatly over time. *Id.* ¶¶ 5-11. The rail routes vary depending on the changes in customers, weather, and rail congestion. *Id.* ¶ 11. The routes taken are not within Spring Creek's control. *Id.* One of the main transporters of Spring Creek's coal is the BNSF Railway (*id.* ¶ 10), which has thousands of miles of rail lines crisscrossing the country. *See* Exhibit B, BNSF Coal Map.[2] Because of the extensive rail transportation routes, it is difficult to know in advance the rail lines over which Spring Creek's coal will be transported and, as a result, the nature or location of any environmental impacts resulting from transporting Spring Creek's coal.

Furthermore, the routes travelled by trains carrying Spring Creek coal are also travelled by many other trains carrying coal from other mines and countless other commodities. Trains transporting coal from other mines in the Powder River Basin and other coal-producing regions are also using the same rail lines. Schwend Decl. ¶ 12; *see also* Exhibit C, "GUIDE TO COAL MINES, Mines

---

[2] Available at: https://www.bnsf.com/ship-with-bnsf/maps-and-shipping-locations/pdf/coal_energy.pdf (last accessed March 18, 2019).

Served by BNSF Railway" (Aug. 1, 2018).[3]  Similarly, according to the U.S. Surface Transportation Board's statistics on railroad economic data, millions of tons of other goods such as farm products, food products, and chemical products (to name a few) were transported by rail across the United States along the same rail lines. *See* Exhibit D. [4]

As a result, it would be practically impossible to attribute any particular environmental impact as being *caused by* transportation of Spring Creek coal mined pursuant to OSMRE's approval of the 2016 mine plan for federal lease MTM-94378.  For example, even if impacts from the release of coal dust could be attributed to coal rail transportation *generally*, those impacts cannot be attributed to Spring Creek coal as opposed to coal from other mines.  The causal link becomes even more attenuated for impacts not specific to coal transportation, such as rail congestion or diesel fumes, which are also caused by rail transportation of other consumer goods.

The Magistrate Judge's recommendation requiring OSMRE to analyze the impacts of transporting Spring Creek coal all across the United States and Canada

---

[3] Available at: https://www.bnsf.com/ship-with-bnsf/maps-and-shipping-locations/pdf/Mine-Guide-2018.pdf (last accessed March 18, 2019).
[4] *See* Surface Transportation Board Commodity Revenue Stratification Report for 2016, available at: https://www.stb.gov/econdata.nsf/09a17a28a74b350d852573ae006d52cd/beb24b3eeb1ec37785257f7a003eb21d?OpenDocument (last accessed March 18, 2019).

fails to recognize the U.S. Supreme Court's mandates in *Public Citizen* and *Metropolitan Edison Co.* that there must be "'a reasonably close causal relationship' between the environmental effect and the alleged cause." *Pub. Citizen*, 541 U.S. at 767; *Metro. Edison Co.*, 460 U.S. at 774. Given the wide-ranging routes used for transporting Spring Creek coal, OSMRE would have great difficulty identifying not only the *nature*, but also the *location*, of the impacts from coal transportation.

This Court must apply NEPA's "rule of reason" and "look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Pub. Citizen*, 541 U.S. at 767. Because there is no "reasonably close causal relationship" between OSMRE's approval of Spring Creek's 2016 mine plan and every conceivable environmental impact occurring across thousands of miles of rail lines, the Court cannot require OSMRE to analyze these remote impacts under NEPA. OSMRE's EA that analyzed the impacts to air quality, wildlife, traffic, and noise in the vicinity of the mine satisfies NEPA's "hard look" requirement. *See* ECF 71 at 18 (citing record support for such localized analysis).

Moreover, the facts underlying the *MEIC* decision related to rail transportation are readily distinguishable from the instant case. In *MEIC*, the court found that "[a] degree of reasonable foreseeability exist[ed]" for purposes of

15

analyzing rail impacts beyond the vicinity of the mine because "there [were] *only a limited number* of rail routes for coal transportation to the east and west available for Bull Mountain coal." *MEIC*, 274 F. Supp. 3d at 1093 (emphasis added). In the case of Spring Creek coal, there are numerous alternate routes for coal to be shipped west to the Westshore Terminal, north and northeast to various Canadian provinces, and south and southeast to end-users in states as far as Arizona and Alabama.

Accordingly, OSMRE had no duty under NEPA to analyze rail transportation impacts beyond the vicinity of the mine because (1) OSMRE had no statutory or regulatory ability to prevent the impacts identified through the NEPA process and, thus, had no duty to analyze those impacts; and (2) there was no close causal relationship between OSMRE's challenged action and the wide-ranging rail transportation impacts across the country and Canada. As a result, OSMRE's analysis of rail transportation impacts satisfied NEPA's "hard look" requirement.

### B. OSMRE Adequately Analyzed the Non-Greenhouse Gas Emission Impacts from Coal Combustion.

The Magistrate Judge found that OSMRE failed to adequately analyze the indirect effects of coal combustion by "only comparing the estimated emissions [from burning Spring Creek coal] to total U.S. emissions, … potentially dilut[ing] the adverse environmental effects of coal combustion at a local level." ECF 71 at 22. The Magistrate Judge then goes on to find broadly that OSMRE "did not

adequately discuss the effects of downstream coal combustion." *Id.* at 24.  It is unclear from the Magistrate Judge's recommendation whether he proposes requiring additional analysis of the effects of coal combustion in Montana power plants (*see id.* at 23), or whether he proposes requiring analysis of the local effects of coal combustion in every state, region, and foreign country, where Spring Creek coal is burned (*see id.* at 24).

If the Magistrate Judge found that OSMRE's analysis was insufficient merely by failing to quantify the criteria pollutants emitted from burning Spring Creek coal in Montana power plants, this finding should be rejected.  After disclosing the regulated air pollutants associated with coal combustion, OSMRE disclosed that there are two plants located near the mine (the Colstrip plant located 55 miles north-northeast of the mine and the Hardin plant located about 56 miles northwest of the mine) but that "[c]oal mined at the [Spring Creek Mine] has not historically been shipped to either of these power plants."  OSM10744.  Based on this finding, OSMRE implicitly disclosed that non-greenhouse gas coal combustion impacts would *not* occur near the mine as a result of approving the proposed action.  *Id.*  Later, in analyzing greenhouse gas emissions, OSMRE disclosed that "[i]n 2014, approximately 86,000 tons (0.53 percent) of coal mined at the [Spring Creek Mine] was burned in Montana power plants."  OSM10785.  Therefore, at worst, OSMRE overlooked analyzing the state level non-greenhouse

gas impacts of burning less than 1% of Spring Creek's coal at the remaining power plants within the state.

This Court should apply NEPA's "harmless error" rule and find such an omission "had *no bearing* on the procedure used *or* the substance of decision reached." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004) (second emphasis added).  An error is harmless where, as here, Plaintiffs cannot show "that this error had any chance (or still has any chance) of altering the agency's deliberation or conclusions." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 347 (6th Cir. 2006) (refusing to reverse OSMRE's mining permit approval because the agency's NEPA violations were harmless error).

As an initial matter, such a minor oversight was "harmless error" because OSMRE had no obligation to analyze combustion related impacts.  ECF 63 at 13-14.  But because OSMRE nonetheless performed a targeted analysis of non-greenhouse gas emissions from coal combustion using nationwide comparisons (a method previously upheld by several courts), OSMRE's analysis should be upheld. *See, e.g., WildEarth Guardians v. Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013); *Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 555 (8th Cir. 2006).

If, however, the Magistrate Judge is recommending that OSMRE be required to analyze the local level emissions everywhere Spring Creek coal is burned, such

a recommendation goes far beyond the scope of NEPA's requirements as limited by *Public Citizen* (discussed above).  Over the past few years, Spring Creek's coal has been combusted (along with coal from countless other mines) in domestic utilities and industrial facilities in Washington, Arizona, Montana, Colorado, North Dakota, South Dakota, Minnesota, Michigan, and Alabama, and in plants across Asia and Canada.  Schwend Decl. ¶¶ 4, 9, 14.  While the Magistrate Judge recognized that OSMRE may properly compare estimated emissions to National Ambient Air Quality Standards ("NAAQS") for purposes of assessing the significance of local health impacts (*see* ECF 71 at 21-22), a similar comparison for analyzing the indirect effects of coal combustion at varying plants in varying states and regions is unwieldy.  The NAAQS (or the equivalent state air quality standards) vary by state and the amount of emissions varies plant-to-plant.  In addition, the amount of emissions *caused by* the combustion of Spring Creek coal at each plant would vary at any given time since Spring Creek coal is burned along with coal from countless other mines.

Indeed, in the recent *WildEarth Guardians* decision involving BLM's oil and gas lease sale, the court refused to require the BLM to quantify the downstream emissions impacts of oil and gas combustion where the oil and gas from the challenged Wyoming leases was "sold on the open market."  2019 WL 1273181, at *19-*20.  The court reasoned that there was a significant difference

between the varied and widespread sales of the oil and gas on the open market and situations where coal is mined for the sole purpose of combustion at one nearby power plant. *Id.* at *19. "Because the coal had a single downstream use, its downstream environmental impact could be estimated to a greater degree of certainty than the downstream impact of oil and gas from the Wyoming Leases sold on the open market."

Here, Spring Creek coal is sold on the open market and combusted all across the United States, in various Canadian provinces, and in Asia.  Like the oil and gas at issue in *WildEarth Guardians*, the downstream emission impacts cannot be quantified with any degree of certainty. Accordingly, this Court should apply the "rule of reason" and the limitations established by *Public Citizen* and reject the Magistrate Judge's Findings and Recommendations concerning OSMRE's analysis of non-greenhouse gas emissions.

### C.     OSMRE Did Not Undertake a Cost-Benefit Analysis and, Therefore, Was Not Required to Quantify the Cost of Greenhouse Gas Emission Impacts.

The Magistrate Judge correctly concluded that "agencies are not required to use the SCC Protocol."  ECF 71 at 25.  However, the Magistrate Judge incorrectly found that OSMRE undertook a cost-benefit analysis by quantifying the socioeconomic benefits of the proposed action (*id.* at 27) and, as a result, OSMRE failed to take a "hard look" at the greenhouse gas emission impacts when it

decided not to also quantify the costs of the proposed action using the SCC

Protocol or any other proxy methodology (*id.* at 30 & n.7).

OSMRE did not undertake a cost-benefit analysis.  OSMRE explained that it

elected not to employ the SCC Protocol because "in order to provide any

meaningful insight, the projected social cost of carbon would need to be viewed *in*

*context with other costs and benefits associated with the Proposed Action*," which

OSMRE did not quantify.  *See* OSM10786 (emphasis added).

OSMRE's analysis of the socioeconomic impacts of authorizing the mining

plan was limited and done in accordance with 40 C.F.R. § 1508.8, which requires

federal agencies' NEPA analyses to consider the "economic" and "social" effects

of a proposed project.  *See also* 30 U.S.C. § 201(a)(3)(C) (requiring OSMRE to

consider "impacted community," "economic activities," and "public services").

Where an agency "briefly mention[s] economic benefits" or includes a "cursory

discussion of the economic benefits" of a proposed project, it is not "obligated. . .

to specifically monetize climate change."  *WildEarth Guardians*, 2019 WL

1273181, at *22 (rejecting WildEarth's argument that BLM was required to use the

SCC Protocol).

The Council on Environmental Quality's ("CEQ") regulations implementing

NEPA explicitly do *not* require OSMRE to undertake *any* cost-benefit analysis:

"*For purposes of complying with the Act*, the weighing of the merits and

drawbacks of the various alternatives *need not be displayed in a monetary cost-benefit analysis* and should not be when there are important qualitative considerations."  40 C.F.R. § 1502.23 (emphasis added).

By recommending that OSMRE be forced to undertake a cost-benefit analysis using the SCC Protocol or another methodology, the Magistrate Judge seeks to impose a NEPA obligation upon OSMRE that has been explicitly rejected by CEQ—the agency entrusted by Congress to implement NEPA.  Moreover, the Magistrate Judge's criticism of OSMRE's stated reason for not using the SCC Protocol as "not a persuasive justification" (ECF 71 at 28) should be rejected because it fails to provide deference to the agency's discretion under NEPA on whether to employ a cost-benefit analysis.  *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1032 (9th Cir. 2006) (CEQ's regulations, which were "promulgated with the purpose of telling federal agencies what they must do to comply with NEPA procedures … [are] entitled to substantial deference." (brackets and internal quotations omitted)); *see also Balt. Gas & Elec. Co.*, 462 U.S. at 103 ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.").

22

## II.    The Magistrate Judge Erred in Finding OSMRE's Decision to Issue a FONSI and Not Prepare an EIS Was Arbitrary and Capricious.

The Magistrate Judge found that OSMRE's decision not to prepare an EIS

was arbitrary and capricious because: (1) the EA failed to take a "hard look" at the

impacts from rail transportation and coal combustion; (2) OSMRE makes "no

mention of [its NEPA] guidelines in the FONSI;" and (3) OSMRE failed to

consider or follow its NEPA guidelines.  ECF 71 at 35-38.  The Magistrate Judge's

findings must be rejected.

First, as discussed above, OSMRE adequately analyzed rail transportation

and coal combustion impacts.  The additional analysis recommended by the

Magistrate Judge goes beyond the scope of OSMRE's statutory authority and

NEPA's mandate.

Second, it is irrelevant whether OSMRE "mentions" its NEPA guidelines in

its FONSI because the Court's review under NEPA must be based on the entire

administrative record.  Under NEPA, the FONSI serves as a "document in which

the agency *briefly* explains the reasons why an action will not have a significant

effect on the human environment and, therefore, why an EIS will not be prepared."

46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981) (emphasis added); *id.* ("The finding

itself need not be detailed …").  The Court's analysis is not limited to the FONSI;

the Court may consider the FONSI and the EA "together" to affirm the "decision

not to prepare an EIS." *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1154 (N.D. Cal. 2013).

Indeed, it would be error to focus solely on the FONSI and ignore the remaining administrative record.  Under the APA, NEPA decisions are reviewed based on "the full administrative record that was before the Secretary at the time he made his decision."  *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1158-59 (9th Cir. 1980). The court must thoroughly examine "the whole record or those parts of it cited by a party" to evaluate the merits of a NEPA claim.  *Ctr. for Biological Diversity v. Skalski*, 61 F. Supp. 3d 945, 951 (E.D. Cal. 2014) (quoting 5 U.S.C. § 706), *aff'd*, 613 F. App'x 579 (9th Cir. 2015).

Here, the administrative record shows that in deciding to tier to the leasing EA and prepare its mine plan EA, OSMRE considered and followed its NEPA guidelines.  *See* OSM10722 ("Using criteria outlined in … the DOI's Departmental Manual (DM) Part 516 (DOI 2004)… OSMRE determined that this EA would tier to and incorporate by reference analyses included in the Environmental Assessment for Spring Creek Coal Lease by Application MTM 94378 EA# MT-020-2007-34"); OSM10730 ("this EA follows guidance in DOI 516 DM (DOI 2004)"); *see also* OSM12092-96.  Upon completing the EA, OSMRE properly issued a FONSI because it found no significant impacts.

As this Court has previously found in analyzing the identical issue: "the existence of the Mining Plan EA itself indicates consideration of whether an EIS was appropriate[.]"  *MEIC v. OSMRE*, 274 F. Supp. 3d 1074, 1101 (D. Mont. 2017).  The *MEIC* holding, as evidenced by this quoted language shows that, contrary to the Magistrate Judge's findings (ECF 71 at 36), the analysis of whether OSMRE properly followed its guidelines should not be limited to the language of the FONSI.  *Id.*

Third, OSMRE's non-binding NEPA guidelines do not—and cannot—require OSMRE to prepare an EIS.  *See Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 786 (9th Cir. 2001) (agency NEPA guidance was not "legally binding" and "proper question" is whether the agency's analysis "complies with NEPA and the NEPA regulations").

The Magistrate Judge is incorrect in finding that the guidelines "indicate an EIS would normally be prepared." ECF 71 at 36. The guidelines' three-factor test for considering whether an EIS is appropriate is not satisfied.  *See* 516 DM 13.4(A)(4).  Contrary to the Magistrate Judge's finding, the first factor—13.4(A)(4)(a)—does not apply because the 2006 EA analyzing lease MTM-94378 adequately considered the environmental impacts of mining the leased coal.  The Magistrate Judge suggests that the 2006 EA did not adequately analyze the impacts of mining the coal under lease MTM-94378 (citing *WildEarth Guardians v.*

*OSMRE*, 2016 WL 259285 (D. Mont. Jan. 21, 2016)), but that EA has never been

challenged and any challenge to it is time-barred.  *See* 28 U.S.C. § 2401(a).  The

*WildEarth* decision did not conclude that the 2006 EA failed to adequately address

the impacts of mining; it merely found that the 2006 EA contemplated later

analysis by OSMRE related to the mine plan approval and OSMRE has now

completed that analysis.

Further, the third factor—13.4(A)(4)(c)—does not apply because the

proposed mine plan *modification* considered by OSMRE added only 5.2 years to

Spring Creek's already approved mining operations.  OSM10728 (Table 1-1).  This

Court's recognition that the challenged proposed action is a *modification* and not

an initial mine plan is important because otherwise, under Plaintiffs' and the

Magistrate Judge's examination of the total life of the mining operations, it would

mean that every modification, no matter how small, would require an EIS if the

mine as a whole planned to operate more than 15 years.  Such an interpretation

would lead to absurd results.

Accordingly, this Court should reject the Magistrate Judge's finding that

OSMRE's decision not to prepare an EIS was arbitrary and capricious.

## III.   The Magistrate Judge Erred in Recommending Any Potential Vacatur of the Mining Plan.

Although the Magistrate Judge agreed with the reasoning previously

articulated by this Court as to why vacatur of the mine plan would be detrimental

to Spring Creek, its employees, and the State of Montana, the Magistrate Judge

nonetheless recommended "deferred" vacatur of the mine plan pending additional

NEPA review.  ECF 71 at 41-42.

Spring Creek objects to this recommendation, not only because OSMRE's

NEPA analysis should be upheld in its entirety, but also because *any* potential

vacatur of the Spring Creek Mine is unwarranted.  *See* ECF 63 at 25-30; ECF 63-2

(Declaration of David Schwend in Support of Spring Creek's Cross Motion for

Summary Judgment).

Vacatur is not a presumptive remedy for a violation under the APA and

NEPA.  *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012);

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, 2016 WL 4445770, at *12

(C.D. Cal. Aug. 12, 2016).  Instead, courts retain considerable discretion to fashion

an appropriate remedy based upon equitable principles.  *Idaho Farm Bureau Fed'n*

*v. Babbitt,* 58 F.3d 1392, 1405-06 (9th Cir. 1995).

Here, equitable principles dictate against vacatur. As discussed in detail in

Spring Creek's prior briefs, if the Spring Creek mine plan is vacated, the Spring

Creek Mine, its employees, the surrounding community, and the environment

would suffer serious consequences.  Vacatur would mean that all operations at the

mine must cease and Spring Creek would be forced to lay off approximately 95%

of its employees.  ECF 63-2 at ¶¶ 16-17.  During the shutdown, Spring Creek

would be unable to perform required reclamation, leading to environmental consequences such as soil erosion, runoff, reduced water quality, spontaneous combustion from exposed coal reserves, fires, unmitigated dust generation, and weed propagation. *Id.* ¶ 15. These significant harms far outweigh any minor analytical errors in OSMRE's NEPA analysis.

## CONCLUSION

For the reasons set forth above, Defendant-Intervenor Spring Creek respectfully objects to the Magistrate Judge's findings that Federal Defendants violated NEPA's "hard look" requirements when approving Spring Creek's 2016 mine plan modification, ECF 71 at 14-30, and that OSMRE's decision not to prepare an EIS was arbitrary and capricious. *Id.* at 34-38. Spring Creek also objects to the recommended remedy of *any* vacatur—including "deferred" vacatur—of Spring Creek's mine plan. *Id.* at 41-42. Spring Creek requests that the Court reject these Findings and Recommendations.

Spring Creek supports the Magistrate Judge's findings that OSMRE did not improperly piecemeal its NEPA analysis, *id.* at 30-34, and that OSMRE did not arbitrarily fail to consider the validity of the underlying coal lease. *Id.* at 38-41. Spring Creek requests that the Court adopt these Findings and Recommendations.

Spring Creek requests that the Court grant the Defendants' Cross Motions for Summary Judgment on all counts and affirm OSMRE's NEPA analysis and mine plan decision in its entirety.

Dated this 21st day of March, 2019.

William W. Mercer
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, MT 59103-0639

*/s/ Andrew C. Emrich*
Andrew C. Emrich (*Pro Hac Vice*)
HOLLAND & HART LLP
6380 South Fiddlers Green Circle, Suite 500
Greenwood Village, CO 80111

Kristina R. Van Bockern *(Pro Hac Vice)*
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202

*Attorneys for Defendant-Intervenor*
*Spring Creek Coal LLC*

**EXHIBIT LIST**

| Exhibit | Description |
|---------|-------------|
| A | Declaration of David Schwend in Support of Spring Creek's Objections |
| B | BNSF Coal Map |
| C | "GUIDE TO COAL MINES, Mines Served by BNSF Railway" (Aug. 1, 2018) |
| D | Surface Transportation Board Commodity Revenue Stratification Report for 2016 |

**CERTIFICATE OF COMPLIANCE**

The undersigned, Andrew C. Emrich, certifies that this Objection complies with the requirements of Rules 7.1(d)(2) and 72.3.  The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman Font typeface consisting of fourteen characters per inch. The total word count is 6,487 words, excluding the caption, the tables, exhibit index, and certificates of compliance and service. The undersigned relies on the word count of the word processing system used to prepare this document.

*/s/ Andrew C. Emrich*
Andrew C. Emrich
*Attorney for Defendant-Intervenor*
*Spring Creek Coal LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2019, I electronically filed the foregoing

document, Defendant-Intervenor Spring Creek Coal LLC's Objections to

Magistrate Cavan's Findings and Recommendations, with the clerk of the court for

the United States District Court for the District of Montana using the CM/ECF

system.

*/s/ Kristina R. Van Bockern*
Kristina R. Van Bockern
*Attorney for Defendant-Intervenor*
*Spring Creek Coal LLC*

12062303