IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS and MONTANA ENVIRONMENTAL INFORMATION CENTER, | CV 17-80-BLG-SPW |
| Plaintiffs, | |
| vs. | ORDER RE MAGISTRATE'S FINDINGS AND RECOMMENDATIONS |
| DAVID BERNHARDT, in his official capacity of Secretary of the Interior, et al., | |
| Defendants, | |
| and | |
| SPRING CREEK COAL, LLC, and NAVAJO TRANSITIONAL ENERGY COMPANY, LLC, | |
| Intervenors. | |

Before the Court is Magistrate Judge Cavan's Findings and

Recommendations, submitted February 11, 2019, addressing cross-motions for

summary judgment filed by Plaintiffs WildEarth Guardians ("WildEarth") and

Montana Environmental Information Center ("MEIC"), Federal Defendants, and

Intervenor Defendant Spring Creek Coal, LLC ("Spring Creek"). (Doc. 71). Judge

1

Cavan recommended that Plaintiffs' motion for summary judgment (Doc. 37) be granted in part, that Federal Defendants' cross-motion for summary judgment (Doc. 59) be denied, and that Spring Creek's cross-motion for summary judgment (Doc. 62) be denied. All parties timely filed objections to Judge Cavan's recommendations. (Docs. 76, 77, 78). However, before the Court could address the merits of the objections, the matter was stayed pending resolution of Spring Creek's bankruptcy proceedings. (Doc. 86). The bankruptcy matter has since resolved with Intervenor Navajo Transitional Energy Company, LLC ("Navajo") purchasing Spring Creek's economic interest in the subject mine. (Docs. 90, 96). Navajo has expressed it will rely on the legal claims made by Spring Creek. (Doc. 100 at 2). After careful review of the filed objections and supplemental authorities (Docs. 92, 100, 101), the Court adopts Judge Cavan's findings and recommendations in full.

## I.   STANDARD OF REVIEW

Plaintiffs, Federal Defendants, and Spring Creek filed timely objections to the findings and recommendations. (Docs. 76, 77, 78). The parties are entitled to de novo review of those portions of Judge Cavan's findings and recommendations to which they properly object. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The Court may accept, reject, or modify, in whole or in part, those findings and recommendations objected to. 28 U.S.C. § 636(b)(1).

## II.    FACTUAL BACKGROUND

No party objected to Judge Cavan's recitation of the background facts of this case. As such, the Court adopts and repeats that recitation here.

This lawsuit follows a prior action in this Court, in which WildEarth challenged the same mining plan modification that is at issue here. *WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation & Enf't, et al.*, 14-CV-13-BLG-SPW-CSO ("*WildEarth I*"). The earlier litigation resulted in summary judgment in favor of WildEarth, with the Court finding the Office of Surface Mining Reclamation and Enforcement ("OSM") violated the public participation and notice provisions of the National Environmental Policy Act ("NEPA"), and failed to take the requisite "hard look" at the consequences of approving the mining plan modification. *WildEarth I*, 2016 WL 259285 (D. Mont. Jan. 21, 2016). The Court, therefore, remanded the matter to OSM for further proceedings, but allowed mining to continue pending remand. *Id.* at *3.

The Spring Creek Mine is a surface coal mine located in Big Horn County, Montana, approximately 32 miles north of Sheridan, Wyoming. (A.R. 10723.) Coal has been mined on a commercial scale at the mine since 1979. (A.R. 10723.)

In 2005, Spring Creek filed an application with the BLM to lease an additional 1,117.7 acres of federal coal in order to extend the life of the mine. (A.R. 10724.) After completing an Environmental Assessment ("EA") and issuing a Finding of

3

No Significant Impact ("FONSI"), BLM issued the lease to Spring Creek, effective December 1, 2007 (referred to as "Federal Coal Lease MTM 94378"). (A.R. 10724.)

In 2008, Spring Creek submitted a permit application to the state to extend coal mining onto Federal Coal Lease MTM 94378. (A.R. 10727.) In June 2011, the Montana Department of Environmental Quality approved the permit. (A.R. 10727.) Spring Creek also proposed a mining plan modification to OSM for the lease. (A.R. 10727.) On June 5, 2012, OSM issued a FONSI, and the mining plan modification was approved. (A.R. 10727.)

In February 2013, conservation groups sued, and as mentioned, the matter was remanded for further proceedings in January 2016. *WildEarth I*, 2016 WL 259285 (Jan. 21, 2016). In response to the Court's ruling, OSM prepared an updated EA in September 2016 (A.R. 10710-815), reissued a FONSI on October 3, 2016 (A.R. 10694-99), and the mining plan modification was again approved.

The instant lawsuit is Plaintiffs' challenge to the updated EA and FONSI.

## III.   LEGAL STANDARDS

No party objected to Judge Cavan's recitation of the legal standards applicable to this ruling. As such, the Court adopts and repeats that recitation here.

### A. NEPA Standard of Review

NEPA is a procedural statute enacted to protect the environment by requiring government agencies to meet certain procedural safeguards before taking action affecting the environment. *See Cal. Ex. rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009). In other words, NEPA "force[s] agencies to publicly consider the environmental impacts of their actions before going forward." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002).

NEPA requires an agency proposing a major federal action significantly impacting the environment to prepare an environmental impact statement ("EIS") to analyze potential impacts and alternatives. 42 U.S.C. § 4332(C). To determine whether an EIS is required, the agency typically first prepares an EA. 40 C.F.R. § 1501.4(b). An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§ 1508.9(a), (b); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

Because NEPA does not contain a separate provision for judicial review, courts review an agency's compliance with NEPA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; 5 U.S.C. § 706(2)(A). Judicial

review of administrative agency decisions under the APA is based on the

administrative record compiled by the agency – not on independent fact-finding by

the district court. *Camp v. Pitts*, 411 US. 138, 142 (1973).

In reviewing an agency action under the APA, the Court must determine

whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with the law." 5 U.S.C. § 706(2)(A). "Normally, an agency rule

would be arbitrary and capricious if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to

a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*

*v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Review under this standard is narrow, and the reviewing court may not

substitute its judgment for that of the agency. *Id*. Review is highly deferential to

the agency's expertise and presumes the agency action to be valid. *Arkansas v.*

*Oklahoma*, 503 U.S. 91, 112 (1992). The agency, however, must articulate a

rational connection between the relevant data and articulate a satisfactory

explanation for its action, including a "rational connection between the facts found

and the choice made." *Id.*; *see also Midwater Trawlers Co-op v. Dep't of*

*Commerce*, 282 F.3d 710, 716 (9th Cir. 2002). Thus, the reviewing court must look

6

at whether the decision considered all of the relevant factors or whether the

decision was a clear error of judgment. *Id.*

A court's review under NEPA is limited to whether the agency "took a 'hard

look' at the environmental impacts of a proposed action." *Nat'l Parks &*

*Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir.

2010). A "hard look" under NEPA requires consideration of all foreseeable direct

and indirect impacts. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957,

973 (9th Cir. 2002). A hard look should involve a discussion of adverse impacts

that does not improperly minimize negative side effects. *Native Ecosystems*

*Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005). "General

statements about possible effects and some risk do not constitute a hard look absent

a justification regarding why more definitive information could not be provided."

*Conservation Cong. v. Finely*, 774 F.3d 611, 621 (9th Cir. 2014). Once the court is

"satisfied that a proposing agency has taken a hard look at a decision's

environmental consequences, [its] review is at an end." *Idaho Conservation*

*League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

**B. Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect

the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A dispute as to a material fact is genuine if there is sufficient evidence for a

reasonable fact-finder to return a verdict for the non-moving party. *Id.*

The moving party bears the initial responsibility of informing the court of

the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the

opposing party will have the burden of proof at trial, the moving party need only

point to an absence of evidence to support the non-moving party's case. *Id.* Courts

may resolve APA challenges via summary judgment. *See Nw. Motorcycle Ass'n v.*

*United States Dep't Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

## IV.  DISCUSSION

### A. Standing

To obtain standing, a plaintiff must demonstrate "(1) it has suffered an injury

in fact that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

action of the defendant; and (3) it is likely, as opposed to merely speculative, that

the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (internal

8

quotations omitted). An environmental organization may properly maintain a suit on its members' behalf "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 181.

Judge Cavan found that MEIC adequately demonstrated standing through the declaration of its member, Steve Gilbert. Mr. Gilbert averred that he has recreated and hunted in the areas surrounding the Spring Creek mine for decades. Specifically, Mr. Gilbert visited the nearby CX Ranch property routinely from 1979 to 1986. He also annually hunts upland birds in the Rosebud Battlefield area, located approximately 7 miles north of the Mine. Finally, Mr. Gilbert regularly fishes in the Tongue River Reservoir located 4 miles east of the Mine. The enjoyment of these activities has been diminished for Mr. Gilbert by his knowledge of the nearby operation of the Spring Creek Mine, the brown haze witnessed above the Mine, and the coal trains regularly seen departing from the Mine. In determining the sufficiency of these harm allegations, Judge Cavan relied on the U.S. Supreme Court's opinion in *Laidlaw* that an environmental plaintiff can establish standing through harm to their esthetic interests in areas near, but necessarily not in, the location of the action itself. 528 U.S. at 181-83. Thus, despite the fact that the Rosebud Battlefield and Tongue River Reservoir are

located miles away from the Spring Creek Mine, Mr. Gilbert's stated harm in his

ability to enjoy hunting and recreating in those area due to the operation of the

Mine suffices to provide MEIC with standing to maintain their lawsuit.

Federal Defendants object to this finding for several reasons. First, Federal

Defendants claim MEIC cannot rely on Mr. Gilbert's statements related to the CX

Ranch property because there is no evidence that he returned the property after

1986 or that he plans to visit the area again. Second, Mr. Gilbert's statement about

the diminished joy he feels hunting in the Rosebud Battlefield because of his

knowledge of the nearby mine is too abstract an injury to support standing. Third,

Federal Defendants find similar fault with Mr. Gilbert's Tongue River Reservoir

statements and the harm he feels knowing the mine is operating nearby. The harms

stated are too attenuated, according to Federal Defendants, because the injuries

stem from Mr. Gilbert's opinion of surface mining and not from any direct effect

of the Mine's operation.

The Court finds these objections unpersuasive. Although the Court agrees

with Federal Defendants that Mr. Gilbert's experiences with the CX Ranch are not

sufficient to constitute standing, his injuries felt in the Rosebud Battlefield are

more than adequate. "The relevant showing for purposes of Article III standing . . .

is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at

181. "The 'injury in fact' requirement in environmental cases is satisfied if an

10

individual adequately shows that she [or he] has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

Mr. Gilbert has hunted upland birds on the Rosebud Battlefield annually since 1977. He states: "the joy I experience while hunting in this area is diminished by my knowledge of the nearby Spring Creek Mine and *its negative impacts on wildlife and their habitat, including the upland game birds that I enjoy hunting and observing in the area*." (Doc. 38-2 at 4) (emphasis added). Mr. Gilbert further states: "It particularly disgusts me to see the trains leaving the Spring Creek Mine because I love that area and I know how much harm the mine has inflicted—and continues to inflict—*on the surrounding landscape and its wild creatures*." (*Id.* at 6) (emphasis added). He describes how it is impossible to visit the areas surrounding the Mine without witnessing the coal trains leaving the site and the coal dust blowing off the tops of the cars due to the fact that the rail lines cross or run parallel to the access roads. (*Id.*). Finally, Mr. Gilbert describes his plans to visit the Tongue River area in the coming spring to hunt turkey in the grasslands near the Mine "*that have not yet been destroyed by the hungry draglines*." (*Id.* at 5) (emphasis added). It is clear from these statements that Mr. Gilbert has an aesthetic and recreational interest in hunting and observing upland birds in the Rosebud

11

Battlefield area and turkeys in the Tongue River area. Mr. Gilbert directly ties

these interests to the nearby Spring Creek Mine and the harmful effects operating

draglines and coal trains, including drifting coal dust, has on the natural

environment and wildlife. The Court agrees with Judge Cavan that these

statements satisfy the injury in fact standing requirement under *Laidlaw*.

### B. Res Judicata

Judge Cavan found that because MEIC satisfied the standing requirements,

principles of res judicata did not bar the current claims as the prior litigation did

not involve the same parties. While Federal Defendants objected to the finding that

MEIC satisfied its standing requirement, no party objected to Judge Cavan's

finding that if MEIC satisfied standing then res judicata would not apply. The

Court agrees that MEIC satisfied its standing requirement. Therefore, principles of

res judicata do not bar the current claims.

### C. Whether the EA Satisfies NEPA's "Hard Look" Requirements

As noted earlier, NEPA requires federal agencies to take a "hard look" at the

consequences of a proposed action by carefully considering all "foreseeable direct

and indirect impacts." *Idaho Sporting Cong.*, 305 F.3d at 973. Indirect effects

include those effects "caused by the action and are later in time or farther removed

in distance but are still reasonably foreseeable." C.F.R. § 1508.8. Examples

provided in the regulations include effects on air, water, and natural ecosystems.

*Id.* NEPA also requires "that an environmental analysis for a single project consider the cumulative impacts of that project together with all past, present and reasonably foreseeable future actions." *Idaho Sporting Cong.*, 305 F.3d at 973; C.F.R. § 1508.7.

Judge Cavan found that OSM failed to take a hard look at the indirect effects of coal transportation, non-greenhouse gas emissions, and greenhouse gas emissions resulting from the mining modification plan. Spring Creek and Federal Defendants object to these findings.

### a. Coal Transportation

According to the findings, OSM failed to consider the impacts of coal transportation on the natural and human environments beyond the area at or near Spring Creek Mine. Judge Cavan determined that a reasonable degree of foreseeability existed for OSM to analyze the indirect and cumulative impacts of transportation—such as diesel emissions, noise, vibrations, and coal dust—based on the destination and route information available. The Magistrate Judge analogized to *Mont. Envtl. Info Ctr. v. U.S. Office of Surface Mining (MEIC)*, 274 F.Supp.3d 1074 (D. Mont. 2017), where Judge Molloy ruled against OSM on very similar arguments and facts.

In *MEIC*, OSM argued it would be too speculative to analyze coal transportation impacts beyond the 35 mile railroad spur line connecting the Bull

13

Mountain Mine to the main railway hubs because OSM could not reasonably
predict where the coal would be shipped and burned. 274 F.Supp.3d 1074, 1092.
Judge Molloy found that the mining plan EA's use of historical data present in the
administrative record to analyze the greenhouse gas emissions from coal
transportation undercut OSM's argument. *Id.* The EA noted that in a past year,
2014, coal from Bull Mountain was shipped primarily overseas with only about 5%
consumed in the United States. *Id.* The EA estimated similar usage and
transportation routes when comparing the levels of greenhouse gases that would be
emitted when transporting coal from the mine expansion. *Id.* Judge Molloy also
noted that a limited number of rail routes existed to transport the coal through
Montana to these destinations. *Id.* at 1093. Thus, the *MEIC* Court determined OSM
acted arbitrarily and capriciously in failing to consider transportation impacts
beyond the connecting rail spur. *Id.*

Judge Cavan found the same logic applied here, as OSM used available
historic shipping information to calculate greenhouse gas emissions attributable to
the mining plan modification. Further, many of the shipping routes and
destinations of previously transported coal were known to OSM when it created
the Spring Creek EA. (AR 10724; 10725; 10808; 15459; 17287; 18732). Because
OSM had access to this information, Judge Cavan found that a reasonable degree
of foreseeability existed for OSM to analyze the indirect and cumulative impacts of

14

coal transportation from Spring Creek Mine. OSM therefore failed to take the required hard look at those indirect transportation impacts.

Further, OSM was not precluded from analyzing the transportation effects because Judge Cavan declined to adopt Spring Creek's argument that the U.S. Supreme Court's holding in *Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004), absolved the federal agency of that responsibility. The *Public Citizen* Court held that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." 541 U.S. at 770. Spring Creek asserted that because OSM had no authority over the rail lines and how the coal was to be transported, *Public Citizen* would not hold the agency responsible as a legally relevant cause of those transportation effects. Citing to several federal court decisions[1], Judge Cavan found this argument meritless, as OSM has broad statutory authority to recommend approval or disapproval of a mining plan based on the information compiled in accordance with the mandates of NEPA.

In their objections, Spring Creek and Federal Defendants urge the Court to reject these findings. Spring Creek asserts Judge Cavan erred in his interpretation of *Public Citizen* and insists OSM lacked the necessary statutory duty to consider coal transportation effects. Both Spring Creek and Federal Defendants argue that,

---

[1] *Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357 (D.C. Cir. 2017); *Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006).

even if *Public Citizen* did not bar OSM from considering transportation effects, there is not a close enough causal connection between OSM's approval of the mining plan and rail transportation because the rail routes vary greatly and it is not reasonably foreseeable where the coal will be shipped to. The Court finds these objections unpersuasive.

"Agencies must consider only those indirect effects that are reasonably foreseeable. They need not consider potential effects that are highly speculative or indefinite." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998). However, "[b]ecause speculation is implicit in NEPA, [a court] must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *California v. Bernhardt*, 472 F.Supp.3d 573, 618 (N.D. Cal. July 15, 2020) (quoting *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (quotations and alterations omitted)).

First, the Court agrees with Judge Cavan's analysis that the holding of *Public Citizen* does not prevent OSM from analyzing the indirect effects of coal transportation in this case. OSM has the statutory obligation to "prepare and submit to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan to the Secretary." 30 C.F.R. § 746.13. The decision document must be stem from several factors including "[i]nformation

16

prepared in compliance with the National Environmental Policy Act . . . ." 30

C.F.R. § 746.13(b). As Judge Cavan found, OSM has the statutory authority to act

on information it compiles under NEPA including reasonably foreseeable indirect

effects of the proposed action. Had OSM analyzed the indirect effects of coal

transportation in this case and determined that those indirect effects weighed

against approval of the mining modification plan, OSM could have presented that

recommendation to the Secretary and urged denying the modification. This ability

to influence the Secretary's decision and urge denial of a mining plan distinguishes

OSM from the Federal Motor Carrier Safety Administration in *Public Citizen*

making the Supreme Court's holding inapplicable. *See Ctr. for Bio. Diversity v.*

*Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020); *Sierra Club v. Fed. Energy Reg.*

*Comm'n*, 867 F.3d 1357, 1373 (D.C. Cir. 2017).

   Second, Spring Creek and Federal Defendants fail to convince the Court that

the same logic presented in *MEIC* (that OSM's knowledge of historic coal

transportation data provided the means to reasonably analyze the indirect effects of

coal transportation) cannot apply in this matter. Just as in *MEIC*, OSM compiled

information on historic shipping routes and destinations for coal mined at Spring

Creek including shipping information from 2015 which OSM used to estimate the

level of greenhouse gas emissions which would be attributable to the mining

modification plan. (AR10751). Federal Defendants readily state as much in their

17

objections. (Doc. 77 at 26). If this information provided some degree of reasonable foreseeability for OSM to consider the impacts of greenhouse gas emissions due to coal transportation, the Court fails to see why that same information cannot lend itself to the "reasonable forecasting and speculation . . . implicit in NEPA" in order to analyze the indirect effects of transportation. *MEIC*, 274 F.Supp.3d at 1092 (quoting *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1075). The Court agrees with Judge Cavan's finding that OSM failed to take a "hard look" at the impacts of coal transportation.

### b. Non-Greenhouse Gas Emissions

Judge Cavan found that OSM failed to take a hard look at the indirect impacts of non-greenhouse gas emissions by failing to discuss the actual effects of non-greenhouse gas emissions and failing to consider both the local and national impacts of burning coal. OSM provided a quantified "tally" of the anticipated pollution emissions from burning coal. However, this tally was insufficient to describe the actual effects of that additional pollution on human and environmental health. Specifically, Judge Cavan determined OSM was aware of the harmful effects burning coal can have on air quality and OSM was aware 95% of the coal mined would be burned to create electricity. (AR 10752, 10775, 10780-81). "As such, OSM was required by NEPA to consider the indirect effects of coal combustion" in addition to simply quantifying the particulates coal combustion

18

would add to the atmosphere. (Doc. 71 at 20). *See Ctr. for Bio. Diversity v. Nat'l Highway Traffic Safety Admin. (NHTSA),* 538 F.3d 1172, 1216 (9th Cir. 2008).

Judge Cavan agreed with Federal Defendants that OSM adequately analyzed the direct effects of burning Spring Creek coal using the National Ambient Air Quality Standards ("NAAQS") to compare anticipated pollutant emission levels to the national averages for those same pollutants. This analysis resulted in OSM's conclusion that the anticipated emissions comprised less than 1% of the national average and were not significant. (AR 10781). However, by failing to likewise compare the effects of downstream combustion emissions at the local level, Judge Cavan found that OSM potentially diluted the adverse environmental impact of the mine modification in contravention to NEPA. *See Pac. Coast Fed. of Fisherman's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036-37 (9th Cir. 2008).

Spring Creek objects to these findings. First, Spring Creek asserts that because less than 1% of coal from the Mine is burned in Montana, the overlooked analysis of the effects that 1% has on local air quality constitutes harmless error. Second, analyzing the effects of non-greenhouse gases in all other locations coal is burnt would prove too unwieldy for consideration. In a similar fashion as their argument above, Spring Creek asserts that because the coal is sold on an open market, the downstream emissions impacts cannot be quantified with "any degree of certainty." (Doc. 76 at 26).

Federal Defendants also object to the findings by arguing OSM sufficiently disclosed the mine's emission history regarding the particulate matter as well as projected emissions of those pollutants for the next six years. They state that any further analysis of the local impacts of the emissions would prove too speculative as OSM does not know where the coal will be burned in the future. Finally, Federal Defendants claim OSM was entitled to rely on local regulators to ensure compliance with air quality standards and therefore did not have to include a downstream effects analysis in its assessment.

NEPA requires agencies to consider all reasonably foreseeable indirect effects of the proposed action. *Presidio*, 155 F.3d at 1163. NEPA does not ask the agencies to predict the future, but neither can agencies throw up their hands on the matter because the analysis requires some speculation. *N. Plains*, 668 F.3d at 1079. Further, "[g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Conservation Cong. v. Finely*, 774 F.3d 611, 621 (9th Cir. 2014).

Judge Cavan is correct that OSM failed to effectively disclose the *effects* of downstream non-greenhouse gas emissions in addition to the quantified levels of emissions. Federal Defendants explained in their objections that OSM "disclosed the mine's historic emissions of particulate matter ($PM_{10}$ and $PM_{2.5}$), sulfur-

dioxide, nitrogen oxides, and mercury, from 2012 to 2015, AR 10781, and

explained that these are 'criteria' pollutants that 'cause or contribute to air

pollution' and that 'may reasonably be anticipated to endanger public health or

welfare.' AR 10741." (Doc. 77 at 26-27). This broad description is not adequate

given the information available to the agency. As Judge Cavan and Federal

Defendants recognized, OSM was able to calculate greenhouse gas emissions on a

state level for Montana and closely analyze the effects of those emissions during

mining operations. (Docs. 71 at 23; 77 at 27). Spring Creek's and Federal

Defendant's argument that it would be too speculative to conduct similar analyses

at other locations where coal would be burned carries no more weight here than it

did in analyzing the effects of coal transportation. OSM had access to data about

known locations where Spring Creek coal has historically been shipped (AR

15459) and the plants where the coal has been burned (AR 18249-50). By omitting

any discussion of local effects of coal emissions or explanation for why a local

effects analysis was not feasible, OSM completed only half of the necessary

analysis. *See NHTSA*, 538 F.3d at 1216 (holding NHTSA's EA analysis inadequate

when it quantified the expected amount of CO2 emitted by the action but failed to

discuss the actual environmental effects the emissions would have on the

environment). Thus, it was not just the indirect effects of burning coal in Montana

that OSM omitted, but the indirect effects of numerous and reasonably foreseeable locations across the country.

Regarding Federal Defendants' argument about OSM's ability to rely on local regulators to ensure compliance with air quality standards, the Court finds this objection unavailing. Federal Defendants rely on *New Mexico ex rel. Richardson v. BLM (Richardson)*, 459 F.Supp.2d 1102, 1114 (D.N.M. 2006), for this conclusion. However, the Tenth Circuit rejected that argument in *Richardson* holding that "the mere presence of these regulations cannot make up for BLM's failure to demonstrate that it 'examined relevant data' supporting a finding that impacts on the Aquifer will be minimal." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 715 (10th Cir. 2009). This Court agrees with that logic and finds the existence of local air quality regulations similarly unpersuasive in relieving OSM of the obligation of examining relevant data on the local effects of burning coal.

### c.  Greenhouse Gas Emissions

Judge Cavan found that OSM failed to take a "hard look" at the costs of greenhouse gas emissions and failed to reasonably justify its reasoning for not quantifying the costs of the mining plan when the Social Cost of Carbon Protocol ("SCC Protocol") was available to do just that. OSM properly used the proxy methodology to discuss the effects of the additional greenhouse gas emissions approval of the mining plan would entail. (AR 10751-52; 10782-87). However,

Judge Cavan determined that OSM then proceeded to quantify the socioeconomic

benefits of the mine expansion without also quantifying the associated

socioeconomic costs. (AR 10810-11; 17459-62; 17488-89). This has effectively

skewed the analysis by adding weight to the beneficial side of the argument

without fairly analyzing the negatives. Relying on *Mont. Envtl. Info Ctr. v. U.S.*

*Office of Surface Mining (MEIC)*, 274 F.Supp.3d 1074 (D. Mont. 2017) and *High*

*Country Conservation Advocates v. U.S. Forest Serv.*, 52 F.Supp.3d 1174 (D.

Colo. 2014), Judge Cavan stressed that NEPA does not require a federal agency to

engage in a cost-benefit analysis. However, when an agency does engage in a

benefit-to-cost balancing analysis, Judge Cavan found it is arbitrary for the agency

to include quantified information about the benefits without including

corresponding information about the costs without reasonable justification.

OSM provided several reasons for not quantifying the costs of greenhouse

gas emissions. First, OSM raised concerns about the lack of consensus "on the

appropriate fraction of social cost of carbon tied to electricity generation that

should be assigned to the coal producer." (AR 10786). Judge Cavan found this

reasoning arbitrary because NEPA requires agencies to consider and discuss all

reasonably foreseeable effects of the proposed action, not assign responsibility for

those effects. *Rittenhouse*, 305 F.3d at 973; 40 C.F.R. § 1502.16, 1508.7, 1508.8.

Second, OSM claimed it chose not to use the SCC Protocols because the agency could not be certain whether greenhouse gas emissions would be affected at all by plan. OSM believed that even if the coal associated with the modified plan was not mined, power plants would simply look to alternative sources for coal to continue operations. Judge Cavan found this reason equally arbitrary. Citing to *MEIC*, 274 F.Supp.3d at 1098 and *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1236 (10th Cir. 2017), Judge Cavan rejected this argument as unsupported by any market data even though modeling tools existed for OSM to calculate the market effects on coal supply.

Third, OSM referenced general uncertainties inherent in using the SCC Protocol "associated with assigning a specific and accurate social cost of carbon to the Proposed Action." (AR 10786-87). As far as these uncertainties pertained to use of ranges of values in the SCC Protocol, Judge Cavan found this to be an invalid concern rejected by multiple courts. *See High Country*, 52 F.Supp.3d at 1192; *Ctr. for Bio. Div.*, 538 F.3d at 1200. Therefore, Judge Cavan determined OSM failed to take a "hard look" at the socioeconomic costs of greenhouse gas emissions.

Spring Creek objects to this finding and argues Judge Cavan erred as OSM expressly did not engage in a cost-benefit analysis of greenhouse gas emissions. Instead, "[OSM] explained that it elected not to employ the SCC Protocol because

24

'in order to provide any meaningful insight, the projected social cost of carbon would need to be viewed *in context with other costs and benefits associated with the Proposed Action*,' which [OSM] did not quantify." (Doc. 76 at 27 (quoting AR 10786)) (emphasis in original). Spring Creek asserts that OSM's analysis of the socioeconomic impacts was limited to a brief discussion of the benefits of the Proposed Action. This limited discussion relieved OSM of the obligation to quantify the costs of greenhouse gas emissions. *WildEarth Guardians v. Zinke*, 2019 WL 1273181, *22 (D.D.C. Mar. 19, 2019). By forcing OSM to engage in a cost-benefit analysis using the SCC Protocol, Judge Cavan would violate the mandates of NEPA and fail to recognize the deference afforded federal agencies.

Federal Defendants similarly object to Judge Cavan's findings as improperly intruding on OSM's choice of methodology in conducting analysis. NEPA provides space for federal agencies to choose the tools most appropriate for the issue and affords broad deference to the agency's methodology. 40 C.F.R. § 1502.23; *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1109-10 (9th Cir. 2016). Federal Defendants worry Judge Cavan's decision would create inappropriate burdens on federal agencies as it would require the agency "to discuss adverse environmental impacts in monetary terms anytime it chooses to discuss positive socioeconomic impacts in monetary terms." (Doc. 77 at 19). Finally, Federal Defendants assert Presidential Executive Order No. 13783, signed

March 28, 2017, rescinded the use of the SCC Protocol and directed federal
agencies to conform to the guidance in another analytic tool.

The Court is unpersuaded by these objections and agrees with Judge Cavan's
findings. Specifically, the Court finds the reasoning laid out by the district court in
*MEIC* entirely applicable to the current arguments and sees no reason not to adopt
the holding of its sister court.

In *MEIC*, the plaintiffs argued that the defendant federal enforcement office
acted arbitrarily when it quantified the benefits of a mine expansion proposal but
failed to quantify the socioeconomic costs of the expansion using the SCC
Protocol. 274 F.Supp.3d at 1094. The enforcement office argued it did not have to
engage in a cost-benefit analysis because NEPA did not require it. *Id.* Judge
Molloy agreed that NEPA did not require the federal agency to conduct the cost-
benefit analysis but found this argument unpersuasive when considering whether it
was arbitrary and capricious for a federal agency to begin a cost-benefit analysis by
quantifying the benefits of the proposed action without then proceeding to quantify
the costs. *Id.* at 1098.  The plaintiffs pointed to the holdings in *High Country* and
*NHTSA* that federal agencies inappropriately put their thumb on the scale when
they quantify the benefits of a proposed plan but fail to quantify the costs. *Id.* at
1096-97. Agreeing with these cases, the *MEIC* court found that the enforcement
office failed to take a hard look at the costs of the greenhouse gas emissions

26

because the office unreasonably quantified the benefits of the plan but not the costs. *Id.* at 1099. The same logic applies here. Although NEPA does not require federal agencies to engage in a cost-benefit analysis, when an agency chooses to quantify the socioeconomic benefits of a proposed action, it would be arbitrary and capricious for the agency to undervalue the socioeconomic costs of that plan by failing to include a balanced quantification of those costs. *NHTSA*, 538 F.3d at 1198.

Finally, Federal Defendants' objections are similarly unpersuasive. Federal Defendants complain that requiring federal agencies to quantify the socioeconomic costs every time an agency quantifies the benefits of a proposal would create a substantial burden and frustrate NEPA's goals of informing the public. However, the precedence of *MEIC* and *NHTSA* has been established for years while federal agencies continue to analyze the economic and environmental impacts of proposed mining plans. The Court doubts today's opinion will be the straw that breaks the federal camel's back. As to Executive Order No. 13783, the Court disagrees with Federal Defendants' interpretation of the Order's reach. Federal agencies cannot ignore more accurate scientific information when it is available. *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). While Executive Order No. 13783 withdrew the technical support documents for the Interagency Working Group's ("IWG") SCC Protocol, it did not change the nature

27

of the scientific information forming the basis for the Protocol. *California v. Bernhardt*, 472 F.Supp.3d 573, 611 (N.D. Cal. July 15, 2020) ("In other words, the President did not alter by fiat what constitutes the best available science. The Executive Order in and of itself has no legal impact on the consensus that IWG's estimates constitute the best available science about monetizing the impacts of greenhouse gas emissions."). Thus, the SCC Protocol remains a viable model tool for monetizing the costs of greenhouse gas emissions despite Executive Order No. 13783.

For these reasons, the Court agrees with Judge Cavan's findings that OSM failed to take a "hard look" at the costs of greenhouse gas emissions.

### D. Piecemealed Analysis

Judge Cavan found that OSM did not improperly segment its analysis of the current mine modification plan when it did not consider the effects of another proposed Spring Creek Mine modification plan ("TR1 expansion") in its decision to approve the current plan. NEPA requires the preparation of a single, comprehensive review for proposals when there is "a single proposal governing the projects or when the projects are connected, cumulative, or similar actions under the regulations implementing NEPA." *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1304 (9th Cir. 2003). However, the Mineral Leasing Act permits mines to expand incrementally through a lease modification process. *See* 30 U.S.C.

28

§ 203; 43 C.F.R. § 3432.2. A comprehensive, cumulative impacts analysis is only

necessary then when the future actions are reasonably foreseeable. 36 C.F.R. §

220.3; 40 C.F.R. § 1508.7. Judge Cavan determined that the TR1 expansion was

not reasonably foreseeable at the time OSM was preparing the current EA because

the TR1 expansion was only in the initial stages of the lease application. The

leasing process in Montana involves several steps requiring approval from the

Montana Department of Environmental Quality and the Secretary of the Interior.

*MEIC*, 274 F.Supp.3d at 1082. Spring Creek had applied for a permit from the

state for the TR1 expansion but had not received approval. Judge Cavan

determined that he could not presume the TR1 expansion would receive approval

at such an early stage. Therefore, the TR1 expansion was not reasonably

foreseeable when OSM conducted the EA at issue.

Judge Cavan also found that the record undermined Plaintiffs' argument that

OSM improperly ignored the cumulative impacts of the entire Spring Creek Mine

operation by focusing narrowly on the modification project. Because the

underlying lease was subject to an environmental review and the EA recognized

the TR1 proposal as well Spring Creek's eight other coal leases, Plaintiffs' reliance

on *Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975) was not persuasive and OSM did

not improperly piecemeal its analysis.

29

In their objections, Plaintiffs renew their argument that OSM improperly segmented its analysis and urge the Court to remand the review for a comprehensive EIS of the entire mine's environmental effects under *Cady*. Plaintiffs assert that a comprehensive review is warranted because all mining operations are interrelated and the cessation of mining in one lease area would cause the immediate shutdown of all mining operations. *See Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985).

Like Judge Cavan, the Court does not find these arguments persuasive. Unlike in *Cady*, where no environmental review was conducted on the approved 30,000 acre coal lease, 527 F.2d at 789, Spring Creek mine modifications have been subject to state and federal environmental reviews including the current EA which expressly contemplated prior environmental analysis and cumulative impacts of the entire mine lease. (AR 16984; 17390).

*Thomas* is also distinguishable from the present review. That case involved a proposed road to facilitate timber sales, but the federal agencies failed to conduct a comprehensive analysis of the environmental impacts of the road combined with the anticipated timber harvest. *Thomas*, 753 F.2d at 755. The Ninth Circuit determined that because the road was interdependent on the timber sales and held no value or utility apart from those sales, it was error for the Forest Service to neglect the planned road in its review. *Id.* at 759. Here, though the lease expansion

30

site is interrelated to the entire Spring Creek Mine operation, the Court is not convinced that the site is interdependent such that the site would have no independent use or value absent the rest of the Mine. The site grants access to over 500 acres of additional coal reserves for the company to mine and make a profit off of regardless of whether the coal company is mining from other lease tracts. This independent value precludes the Court from following the Ninth Circuit's lead in *Thomas* and requiring a comprehensive environmental study necessary.

Finally, the Court does not find that the EA at issue here ignored or sought to minimize the impacts of the entire mine site including the proposed TR1 expansion. OSM's analysis recognized that Spring Creek operated in eight distinct tracts apart from the currently proposed expansion at a rate of 18 million tons of coal per year. *See* AR 10723-28; 10734-35; 10738; 10775-84. OSM acknowledged operations of this scale when considering whether to approve the mine expansion. AR 10694. These references persuade the Court that OSM complied with NEPA's regulation to consider the cumulative impacts of reasonably foreseeable future actions. 36 C.F.R. § 220.3; 40 C.F.R. § 1508.7. However, the Court agrees with Judge Cavan that the TR1 expansion could not be included as a reasonably foreseeable future action because the expansion had not yet been approved. As such, OSM was not required to consider the uncertain project. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013).

31

For these reasons, OSM did not improperly segment its analysis of the Spring Creek expansion.

### E. Decision Not to Prepare an EIS

Judge Cavan found OSM's decision not to prepare an EIS arbitrary and capricious due to the agency's failure to adequately explain why the presumption to prepare an EIS did not apply to this case. An EIS is required under NEPA to examine any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Citing to *Ocean Advocates v. U.S. Army Corps of Eng'rs*, Judge Cavan recognized that "[a]n EIS must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor. To trigger this requirement a plaintiff need not show that significant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient." 402 F.3d 846, 864-65 (9th Cir. 2005). Because OSM's analysis of coal transportation, non-greenhouse gas emissions, and greenhouse gas emissions were insufficient, Judge Cavan determined that OSM's decision not to prepare an EIS was arbitrary and capricious.

Judge Cavan also found that OSM arbitrarily and capriciously failed to follow the agency's own guidelines in not preparing an EIS when an EIS would

32

otherwise have been warranted under the circumstances. Section 516 DM

13.4(A)(4) of the guidelines states:

> A.  The following OSM actions will normally require the preparation of
>
> an EIS:
>
> (4)  Approval of a proposed mining and reclamation plan for
>
> surface mining operation that meets the following:
>
> (a)  The environmental impacts of the proposed mining
>
> operation are not adequately analyzed in an earlier environmental
>
> document covering the specific leases or mining activity; and
>
> (b)  the area to be mine is 1280 acres or more, or the annual
>
> full production level is 5 million tons or more; and
>
> (c)  Mining and reclamation operations will occur for 15
>
> years or more.

All three criteria were met, in Judge Cavan's findings, because (1) the Court

previously determined the prior BLM EA did not adequately address the mining

plan modification in *WildEarth I,* 2016 WL 259285 at *2; (2) the mine expansion

is expected to continue the current mine output of 18 million tons of coal per year;

and (3) mining and reclamations projects will last over 15 years. Thus, according

to OSM's guidelines, an EIS should have been prepared.

33

The bulk of Spring Creek's and Federal Defendants' first objection depends on their contention that OSM did adequately examine the impacts of coal transportation, non-greenhouse gas emissions, and greenhouse gas emissions. Because the Court has already determined OSM did not sufficiently analyze these impacts, this argument is unpersuasive.

Spring Creek and Federal Defendants also object to Judge Cavan's finding that OSM's guidelines were contravened when OSM failed to conduct an EIS on the mine expansion. The parties argue that element (a) of the guidelines was not satisfied because the foreseeable environmental impacts were adequately analyzed. However, this contention again depends on the Court finding favorably for Spring Creek and Federal Defendants that OSM sufficiently considered the environmental impacts of coal transportation, non-greenhouse gas emissions, and greenhouse gas emissions. The Court did not find in OSM's favor on these issues and the objection is now meritless. Therefore, the Court agrees that OSM's decision not to prepare an EIS was arbitrary and capricious[2].

**F. Validity of Underlying Lease**

Judge Cavan found that Plaintiffs' claims regarding the validity of the underlying federal coal lease were time barred by the statute of limitations and

---

[2] Spring Creek also asserts that element (c) of the guidelines was not met because the proposed mine modification only added 5.2 years to the duration of the mine operation. However, Spring Creek mentions nothing about reclamation operations which generally occur long after mining operations have shut down. The Court finds this objection unpersuasive.

lacked merit. No party objected to this finding and the Court does not find that Judge Cavan committed clear error in arriving at his determination. The Court agrees with and adopts Judge Cavan's finding on this issue.

### G. Remedy

Judge Cavan recommends that vacatur of the mining plan approval be deferred for a period of 240 days from the date of this order. This is the same remedy the Court issued in *WildEarth I* after weighing the equitable interests of the Spring Creek Mine against the State of Montana and the public in general. 2015 WL 6442724 at *9. Plaintiffs argue the repeated failure of OSM to fulfill its NEPA obligations warrant an immediate injunction of mining operations and a vacatur of the EA, FONSI and mining plan approval. Spring Creek asserts that any kind of vacatur, even deferred vacatur, is inappropriate.

The Court agrees with Judge Cavan that the same equitable factors at issue in *WildEarth I* warrant a deferred vacatur here. Therefore, the Court orders that Federal Defendants shall have 240 days from the date of this order to complete a corrective NEPA analysis and prepare an updated EA. Federal Defendants may seek leave to extend the deadline should they determine an EIS is warranted.

### V.   CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 37) is **GRANTED IN PART** as set forth above.

**IT IS FURTHER ORDERED** that Federal Defendants' Cross-Motion for Summary Judgment (Doc. 59) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant-Intervenor Spring Creek Coal LLC's Cross-Motion for Summary Judgment (Doc. 62) is **DENIED**.

Federal Defendants shall have 240 days from the date of this order to complete a corrective NEPA analysis and prepare an updated EA. Federal Defendants may seek leave to extend the deadline should they determine an EIS is warranted.

DATED this _3rd_ day of February 2021.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge

36