Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 708-3058
hornbein@westernlaw.org

Shiloh S. Hernandez
Earthjustice
Northern Rockies Office
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9692 ext. 1929

*Counsel for Plaintiffs*

Samantha Ruscavage-Barz
(NM Bar #23276)
WildEarth Guardians
301 N. Guadalupe At., Ste. 201.
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org
*Admitted pro hac vice*

*Counsel for Plaintiff WildEarth
Guardians*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS and MONTANA ENVIRONMENTAL INFORMATION CENTER, <br><br> Plaintiffs, <br><br> vs. <br><br> DEB HAALAND, et al., <br><br> Defendants. | Case No. CV 17-80-BLG-SPW-TJC <br><br><br> **PLAINTIFFS' RESPONSE IN PARTIAL OPPOSITION TO FEDERAL DEFENDANTS' MOTION FOR DEADLINE EXTENSION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

EXHIBIT INDEX ......................................................................... vi

INTRODUCTION .......................................................................... 1

LEGAL STANDARD ........................................................................ 2

ARGUMENT .............................................................................. 5

I.    NEPA PROHIBITS ACTIONS THAT HAVE ADVERSE
ENVIRONMENTAL EFFECTS OR WILL LIMIT THE CHOICE OF
REASONABLE ALTERNATIVES PENDING PREPARATION OF
AN EIS ................................................................................ 5

    A.    Because continued stripping, shipping, and burning of coal
from the Spring Creek Mine will cause adverse environmental
impacts, it is prohibited pending preparation of an EIS ..................... 6

    B.    Because NTEC can strip-mine all remaining coal reserves in the
expansion area during OSM's preparation of an EIS, allowing
continued mining would improperly limit the choice of
reasonable alternatives. ..................................................... 8

II.    THE EQUITIES SUPPORT PARTIAL VACATUR PAUSING
MINING, BUT NOT RECLAMATION OPERATIONS, PENDING
ENVIRONMENTAL REVIEW. .................................................. 10

    A.    OSM demonstrates the seriousness of its NEPA violations by
acknowledging that the mine may cause significant
environmental harm necessitating preparation of an EIS. ................. 11

    B.    Continued mining and combustion of coal from the Spring
Creek Mine will cause extraordinary harm that greatly
outweighs any disruptive consequences of partial vacatur. ............... 14

CONCLUSION ........................................................................... 25

CERTIFICATE OF COMPLIANCE ........................................................ 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*All. for Wild Rockies v. Savage*,
  375 F. Supp. 3d 1152 (D. Mont. 2019)..................................................4

*All. for Wild Rockies v. Tidwell*,
  907 F.3d 1105 (9th Cir. 2018) ...........................................................3

*Cal. Cmties. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) .............................................................3

*Coal. to Protect Puget Sound Habitat v. USACE*,
  466 F. Supp. 3d 1217 (W.D. Wash. 2020) ....................................*passim*

*Coal. to Protect Puget Sound Habitat v. USACE*,
  843 F. App'x 77 (9th Cir. 2021) .........................................................5

*Conservation Cong. v. USFS*,
  803 F. Supp. 2d 1126 (E.D. Cal. 2011) ............................................20

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) .............................................................2

*Desert Citizens Against Pollution v. Bisson*,
  231 F.3d 1172 (9th Cir. 2000) .........................................................20

*Diné Citizens Against Ruining Our Env't v. OSM*,
  No. 12-cv-1275-JLK, 2015 WL 1593995 (D. Colo. Apr. 6, 2015).............23, 24

*hiQ Labs., Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) ...........................................................20

*Humane Soc'y v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) ...........................................................3

*Hunters v. Marten*,
  470 F. Supp. 3d 1151 (D. Mont. 2020)................................3, 4, 19, 23

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Pena*,
  No. 3:12-CV-02271-HZ, 2015 WL 1567444 (D. Or. Apr. 6, 2015)............ 18-19

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. USFS*,
No. 3:10-CV-01397-SI, 2012 WL 13042847 (D. Or. Dec. 10, 2012) ................................................................................ 4-5

*League of Wilderness Defs. v. Connaughton*,
752 F.3d 755 (9th Cir. 2015) ............................................22

*Monsanto v. Geertson Seed Farms*,
561 U.S. 139 (2010)......................................................3, 8

*Mont. Wilderness Ass'n v. Fry*,
408 F. Supp. 2d 1032 (D. Mont. 2006)............................14

*N. Plains Res. Council v. USACE*,
460 F. Supp. 3d 1030 (D. Mont. 2020)......................*passim*

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005) ..............................................3

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ..........................................3, 4

*S. Or. Citizens Against Toxic Sprays v. Clark*,
720 F.2d 1475 (9th Cir. 1983) ...........................................5

*Se. Alaska Conservation Council v. USFS*,
468 F. Supp. 3d 1148 (D. Alaska 2020) ....................*passim*

*Sovereign Iñupiat for a Living Arctic v. BLM*,
No. 3:20-cv-290-SLG (D. Alaska Aug. 18, 2021) ............24

*Standing Rock Sioux v. USACE*,
985 F.3d 1032 (D.C. Cir. 2021)......................9, 11, 20, 22

*State of Cal. v. Block*,
690 F.2d 753 (9th Cir. 1982) ..............................................3

*Swan View Coal. v. Weber*,
52 F. Supp. 3d 1160 (D. Mont. 2014).............................23

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001)...........................................................5

*WildEarth Guardians v. OSM*,
   No. 14-cv-112 (D.N.M. Aug. 31, 2016) ............................................................23

*WildEarth Guardians v. OSM*,
   No. CV 14-13-BLG-SPW-CSO, 2015 WL 6442724 (D. Mont. Oct.
   23, 2015) .........................................................................................................20

*WildEarth Guardians v. Steele*,
   No. CV 19-56-M-DWM, 2021 WL 2590143 (D. Mont. June 24,
   2021) .........................................................................................................*passim*

## Statutes and Legislative Materials

5 U.S.C. § 706(2)(A) ..........................................................................................3

42 U.S.C. § 4332(2)(C) .......................................................................................6

## Regulations and Administrative Materials

40 C.F.R. § 1501.3(a)(2) ......................................................................................6
            § 1506.1 .............................................................................................3
            § 1506.1(a) ................................................................................*passim*
            § 1506.1(a)(1)-(2) ..............................................................................1
            § 1506.1(a)(2) ....................................................................................9

86 Fed. Reg. 7,037 (Jan. 20, 2021) .................................................................7, 12

86 Fed. Reg. 7,619 (Jan. 27, 2021) ..................................................15-16, 21-22

Dep't of Interior, Sec. Order 3399
      § 1 (Apr. 16, 2021)...........................................................................16
      § 5(b) (Apr. 16, 2021).......................................................................12

## State Regulations and Administrative Materials

Mont. Code Ann. § 75-1-201(2)(a)..................................................................21

**OTHER AUTHORITIES**

Interagency Working Group on Coal and Power Plant Communities
and Economic Revitalization, Initial Report to the President on
Empowering Workers Through Revitalizing Energy Communities
(April 2021), *available at* https://www.whitehouse.gov/briefing-
room/statements-releases/2021/04/23/fact-sheet-biden-
administration-outlines-key-resources-to-invest-in-coal-and-
power-plant-community-economic-revitalization/............................................22

U.S. Energy Information Administration, Coal Data Browser, Spring
Creek Coal Company, Annual,
https://www.eia.gov/coal/data/browser/#/mine/2401457?freq=A&s
tart=2001&end=2019&ctype=linechart&ltype=pin&columnchart=
COAL.MINE.PRODUCTION.2401457-SUB-
SUR.A&linechart=COAL.MINE.PRODUCTION.2401457-SUB-
SUR.A&maptype=0&pin= ..................................................................................9

# EXHIBIT INDEX

Exhibit 1     Declaration of Brian Moench, M.D.

Exhibit 2     Declaration of David Schlissel

Exhibit 3     Declaration of Thomas Power

Exhibit 4     Declaration of James Hansen

Exhibit 5     Declaration of Derf Johnson

Exhibit 6     Declaration of Wade Sikorski

Exhibit 7     Interagency Working Group on Coal and Power Plant Communities
and Economic Revitalization, Initial Report to the President on
Empowering Workers Through Revitalizing Energy Communities
(April 2021)

## INTRODUCTION

After nearly a decade of litigation and two adverse rulings from this Court, Federal Defendants (collectively, "OSM") finally acknowledge that strip-mining 100 million tons of coal at the Spring Creek Mine may result in significant environmental impacts, triggering the need to prepare an environmental impact statement (EIS). (Doc. 142 at 2.) While Plaintiffs WildEarth Guardians and Montana Environmental Information Center (together, "Guardians") appreciate OSM's decision to fully evaluate and disclose the significant environmental harm from this massive strip-mining operation, the agency's proposal to allow strip-mining to continue for nearly two years pending OSM's review of the operation is unlawful and inequitable.

To be clear, Guardians does not oppose OSM's requested extension of time to prepare an EIS. (*Id.* at 4-6.) Guardians does, however, firmly oppose OSM's request to defer vacatur—and allow strip-mining in the expansion area—for the approximately two years it will take the agency to prepare the EIS. (*Id* at 6-7.) Such lengthy deferral of vacatur violates NEPA's flat prohibition on actions that have "adverse environmental impact[s]" or that limit the choice of reasonable alternatives pending preparation of an EIS. 40 C.F.R. § 1506.1(a)(1)-(2). It is also unwarranted given the devastating impacts to human health and the environment from mining and burning Spring Creek coal.

1

Instead, Guardians requests a compromise remedy: that this Court grant partial vacatur to allow reclamation—but not mining—activities to continue because reclamation does not cause "adverse environmental impact[s]." Moreover, to ensure an orderly process to wind down operations in the expansion area pending OSM's review, Guardians requests that this Court defer partial vacatur (and thereby allow mining operations) for three months, until January 1, 2022. This would avoid an abrupt closure and would allow time for OSM and Spring Creek to make appropriate plans—consistent with the Biden Administration's policies to support and fund just transition activities in energy communities—to protect miners and local communities during the review process.

## LEGAL STANDARD

NEPA strictly limits activities that may proceed pending completion of an EIS. Subject to two inapplicable exceptions,

> until an agency issues a finding of no significant impact, as provided in § 1501.6 of this chapter, or record of decision, as provided in § 1505.2 of this chapter, no action concerning the proposal may be taken that would:
>
> (1) Have an adverse environmental impact; or
>
> (2) Limit the choice of reasonable alternatives.

40 C.F.R. § 1506.1(a). Like all of NEPA's requirements, this provision must be "strictly interpreted" to further the environmental protection goals of NEPA. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (quoting

2

*State of Cal. v. Block*, 690 F.2d 753, 769 (9th Cir. 1982)). The Supreme Court

recognizes this mandatory limitation on activities that may occur "during the

pendency of the EIS process." *Monsanto v. Geertson Seed Farms*, 561 U.S. 139,

160 n.5 (2010) (citing 40 C.F.R. § 1506.1); *see also Nat'l Audubon Soc'y v. Dep't

of Navy*, 422 F.3d 174, 201 (4th Cir. 2005) (explaining that 40 C.F.R. § 1506.1(a)

"prohibit[s] … activities that cause environmental harm or 'limit the choice of

reasonable alternatives'" but permits "activities … which do not have such effects

and may proceed while an EIS is pending").

The presumptive remedy for unlawful agency action is vacatur and remand.

*All. for Wild Rockies v. Tidwell*, 907 F.3d 1105, 1121-22 (9th Cir. 2018); *Hunters

v. Marten*, 470 F. Supp. 3d 1151, 1181 (D. Mont. 2020); 5 U.S.C. § 706(2)(A)

("The reviewing court shall … hold unlawful and set aside agency action … found

to be … arbitrary [and] capricious …."). "When equity demands, however, the

regulation can be left in place while the agency reconsiders or replaces the action,

or to give the agency time to follow the necessary procedures." *Alliance for Wild

Rockies*, 907 F.3d at 1121. The Ninth Circuit has only approved remand without

vacatur in "rare" and "limited circumstances." *Humane Soc'y v. Locke*, 626 F.3d

1040, 1053 n.7 (9th Cir. 2010); *Pollinator Stewardship Council v. EPA*, 806 F.3d

520, 532 (9th Cir. 2015) (quoting *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d

989, 994 (9th Cir. 2012)).

"In determining the appropriate remedy, the Court must weigh the seriousness of the agency's errors against the 'disruptive consequences of vacatur.'" *All. for Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1155-56 (D. Mont. 2019) (quoting *Pollinator Stewardship Council*, 806 F.3d at 532). "Put differently, courts may decline to vacate agency decisions when vacatur would cause *serious and irremediable harms* that *significantly outweigh* the magnitude of the agency's error." *WildEarth Guardians v. Steele*, No. CV 19-56-M-DWM, 2021 WL 2590143, at *21 (D. Mont. June 24, 2021) (emphasis added) (quoting *Se. Alaska Conservation Council v. USFS*, 468 F. Supp. 3d 1148, 1150 (D. Alaska 2020)). In this balancing analysis, "[t]he burden is on the parties opposing invalidation of unlawful agency action to rebut the APA's 'presumption of vacatur' by showing that the equities demand remand without vacatur." *Coal. to Protect Puget Sound Habitat v. USACE*, 466 F. Supp. 3d 1217, 1226 (W.D. Wash. 2020). "In the context of environmental regulation," courts give particular attention to "whether vacating the invalid rule would risk environmental harm." *Id.* at 1220; *Pollinator Stewardship Council*, 806 F.3d at 532.

"A district court may exercise [its] discretion where appropriate to order partial, rather than complete, vacatur." *N. Plains Res. Council v. USACE*, 460 F. Supp. 3d 1030, 1037 (D. Mont. 2020); *Hunters*, 470 F. Supp. 3d at 1181-82 (granting partial vacatur); *League of Wilderness Defs./Blue Mountains Biodiversity*

*Project v. USFS*, No. 3:10-CV-01397-SI, 2012 WL 13042847, at \*5 (D. Or. Dec. 10, 2012) (same).

A district court's decision on vacatur is reviewed for abuse of discretion. *Coal. to Protect Puget Sound Habitat v. USACE*, 843 F. App'x 77, 80 (9th Cir. 2021).

## ARGUMENT

### I.   NEPA PROHIBITS ACTIONS THAT HAVE ADVERSE ENVIRONMENTAL EFFECTS OR WILL LIMIT THE CHOICE OF REASONABLE ALTERNATIVES PENDING PREPARATION OF AN EIS.

"Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). Thus, while courts retain equitable discretion to deny vacatur, they may not in equity permit activities that the law expressly forbids. Here, NEPA regulations expressly prohibit actions that will either cause adverse environmental impacts or limit reasonable alternatives pending completion of an EIS. 40 C.F.R. § 1506.1(a); *S. Or. Citizens Against Toxic Sprays v. Clark*, 720 F.2d 1475, 1478 (9th Cir. 1983) ("The CEQ's regulations are binding on administrative agencies …."). These provisions therefore foreclose wholesale extension of the deferral of vacatur until 2023 when OSM expects to complete its EIS.

**A.      Because continued stripping, shipping, and burning of coal from the Spring Creek Mine will cause adverse environmental impacts, it is prohibited pending preparation of an EIS.**

There is no question that continued operation of the Spring Creek Mine, specifically the mining, shipping, and burning of coal, will cause adverse environmental effects. Indeed, OSM's decision to prepare an EIS indicates the agency believes the mine expansion may cause "significant" adverse environmental effects. *See* 42 U.S.C. § 4332(2)(C) (requiring an EIS for activities that "significantly affect[] the quality of the human environment"); 40 C.F.R. § 1501.3(a)(2) (providing an EIS is "appropriate" for actions "likely to have significant effects"). Moreover, in its environmental assessment (EA), OSM acknowledges that combustion of coal from the mine will cause enormous amounts of pollution: over 30 million tons of greenhouse gas (GHG) pollution and over 100,000 tons of harmful criteria pollution each year. AR:2-664-10781 to -10783. This will cause widespread harm to people and the environment, including hundreds of cases of premature mortality and thousands of cases of respiratory distress each year from criteria pollution alone. Declaration of Brian Moench, M.D., ¶ 4 (Exhibit 1). It will also contribute substantially to the national burden of lead and mercury poisoning. *Id.*, ¶¶ 12-26. The economic harm from this loss of life is staggering. *Id.*, ¶ 4 (estimating annual mortality costs of $2.09 billion).

6

As bad as these impacts are, the climate impacts from the mine's GHG emissions may be worse. Recent research shows that the heat-related mortality from GHG emissions alone is substantial—each approximately 4,000 metric tons of carbon dioxide ($CO_2$) will cause one additional heat-related death. *Id.*, ¶ 27. The toll from the approximately 30 million tons of GHGs emitted by the Spring Creek Mine each year numbers in the thousands. *Id.* The economic impact mirrors these figures. Using Defendant Department of Interior's[1] own central valuation of the Social Cost of Carbon (SCC) ($51 per metric ton of carbon dioxide ($CO_2$)), the annual GHG emissions from the Spring Creek Mine will cause approximately $1.58 billion in climate harms—such as lost agricultural productivity, harm to human health, and flooding—to the public. Declaration of David Schlissel, ¶¶ 2-5 (Exhibit 2); Declaration of Thomas Power, ¶¶ 4-7 (Exhibit 3). These extensive harms constitute adverse environmental effects.

---

[1] The Department of Interior is a participating member of the Interagency Working Group on the Social Cost of Greenhouse Gases. Exec. Order 13,990 § 5(b)(i), 86 Fed. Reg. 7,037, 7,040 (Jan. 20, 2021).

Accordingly, under the plain language of 40 C.F.R. § 1506.1(a), no such action "may be taken." *See Monsanto*, 561 U.S. at 160 n.5 (recognizing limitation).[2]

**B.     Because NTEC can strip-mine all remaining coal reserves in the expansion area during OSM's preparation of an EIS, allowing continued mining would improperly limit the choice of reasonable alternatives.**

Continued mining in the expansion areas pending completion of an EIS in 2023 is further foreclosed because it would significantly limit the choice of reasonable alternatives. In particular, continued mining will limit and potentially preclude the selection of any reduced mining or no mining alternative.

Strip-mining in the challenged mine expansion area has been permitted, albeit unlawfully, since 2012. AR:2-664-10722. As originally approved in 2012, the challenged mine expansion comprised approximately 103.2 million tons of coal. AR:2-664-10727. By December 2015, 18.4 million tons had been strip-mined, and only 84.8 million tons remained. AR:2-664-10727. In 2016, when OSM approved the mine expansion for the second time, it projected that the remaining coal reserves would be mined in 4.7 years if mining were to continue at a rate of 18 million tons per year. AR:2-664-10728. Data from the U.S. Energy

---

[2] Notably, because this harm is associated with the combustion of coal, it does not apply to reclamation or remediation activities occurring in the mine expansion area. Accordingly, consistent with the NEPA regulations, reclamation and remediation activities may continue during the EIS process.

Information Administration indicates that the mine has extracted approximately 12 million tons per year since 2016.[3] It thus appears that the expansion area has nearly been mined out. There may be only 24 million tons or less remaining in the expansion area.

At recent mining rates (approximately 12 million tons per year), by 2023, when OSM expects to finish it EIS, mine operator Intervenor-Defendant Navajo Transitional Energy Company (NTEC) will either have strip-mined *all* remaining federal coal reserves in the expansion area or it will have strip-mined the vast majority of those federal coal reserves. This will not only significantly limit the choice of any reduced-mining alternatives, it may moot the entire EIS process. To avoid this type of charade, in which an agency studies and discloses to the public impacts that have already occurred, 40 C.F.R. § 1506.1(a)(2) prohibits agencies from taking actions that "[l]imit the choice of reasonable alternatives." *See Standing Rock Sioux v. USACE*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) (noting that "it would subvert NEPA's purpose" to allow agencies to "build first and conduct comprehensive reviews later").

---

[3] U.S. Energy Information Administration, Coal Data Browser, Spring Creek Coal Company, Annual, https://www.eia.gov/coal/data/browser/#/mine/2401457?freq=A&start=2001&end=2019&ctype=linechart&ltype=pin&columnchart=COAL.MINE.PRODUCTION.2401457-SUB-SUR.A&linechart=COAL.MINE.PRODUCTION.2401457-SUB-SUR.A&maptype=0&pin= (last visited August 18, 2021).

In sum, because continued strip-mining, shipping, and burning coal from the expansion area of the Spring Creek Mine will cause adverse environmental effects and limit reasonable alternatives, it may not occur during the pendency of OSM's EIS process. 40 C.F.R. § 1506.1(a). This does not prevent this Court from extending the deadline for OSM to complete the EIS. Nor does it prevent this Court from permitting reclamation and remediation activities at the mine to occur during the EIS process. It does, however, foreclose continued strip-mining in the expansion area.[4]

## II. THE EQUITIES SUPPORT PARTIAL VACATUR PAUSING MINING, BUT NOT RECLAMATION OPERATIONS, PENDING ENVIRONMENTAL REVIEW.

While 40 C.F.R. § 1506.1(a) itself forecloses OSM from permitting strip-mining operations in the expansion area pending completion of an EIS (and this Court need go no further in its analysis), the equities of this case also do not support a departure from the presumptive remedy of vacatur.

---

[4] This does not prevent Spring Creek from mining coal reserves that are not in the expansion area approved by the mining plan modification challenged in this case. NTEC has acknowledged that it could reconfigure its mine to mine other reserves, albeit at a reduced rate. (Doc. 105-7, ¶¶ 19-20.)

**A.    OSM demonstrates the seriousness of its NEPA violations by acknowledging that the mine may cause significant environmental harm necessitating preparation of an EIS.**

OSM makes no argument that its errors were not serious and accordingly fails to carry its burden on the first element of the test. (Doc. 142 at 6-7.) This alone is fatal to its request to extend the deferral of vacatur. In any event, OSM's NEPA violations are serious and warrant partial vacatur of its unlawful approval of the mine expansion.

An agency's unlawful decision not to prepare an EIS is sufficiently serious to support vacatur unless "the agency could, with further explanation, justify its decision to skip that procedural step," i.e., forego preparation of an EIS. *Standing Rock Sioux*, 985 F.3d at 1052. Here, OSM cannot meet that standard because the agency itself now concedes that, even with further explanation, it cannot justify its 2016 (and 2012) decision to forego preparation of an EIS for the mine expansion. (Doc. 142-1, ¶ 4 (determining "that it would be appropriate to stop work on the EA and to instead prepare an environmental impact statement (EIS) to analyze the impacts of the mining plan modification").) As in *Standing Rock Sioux*, 985 F.3d at 1051, the seriousness of OSM's NEPA violation is aggravated by the fact that this Court "had previously remanded without vacatur" for the purpose of remedying the agency's NEPA violation but the agency "had nonetheless failed" to do so on its

11

second attempt. (*See* Doc. 102 at 3 (noting prior remand of 2012 decision without vacatur).)

OSM's other NEPA violations are equally serious. OSM "skewed" its analysis of the mine's GHG emissions by disclosing the economic benefits of the mine expansion "without fairly analyzing the negatives," even though it had the means to do so with the SCC. (*Id.* at 22-23.) Both the current Administration and the Department of Interior now agree and recognize that "[i]t is *essential* that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account." Exec. Order 13,990 § 5, 86 Fed. Reg. at 7,040 (emphasis added); Dep't of Interior, Sec. Order 3399, § 5(b) (Apr. 16, 2021) (explaining that "when a Bureau/Office determines that a monetized assessment of socioeconomic impacts is relevant, the SC-GHG protocol is an essential tool to quantify the costs and benefits associated with a proposed action's GHG emissions").

OSM's skewed and one-sided analysis of the impacts of the Spring Creek Mine's GHG emissions therefore "undermined the 'two fundamental objectives of NEPA': the agency's careful consideration of 'detailed information concerning significant environmental impacts' and the public's ability to participate in the decision-making process." *Se. Alaska Conservation Council*, 468 F. Supp. 3d at 1152. By touting the mine expansion's economic benefits ($379.3 million in state

and federal revenue over the life of the expansion, AR:2-664-10810), while failing to disclose the much more significant costs to the public from the mine's GHG emissions (approximately $1.5 billion each year, Schlissel Decl., ¶ 5, Power Decl., ¶¶ 4, 7), OSM prevented the public and decision-makers from fairly assessing the action and no-action alternatives. As in *Southeast Alaska Conservation Council*, 468 F. Supp. 3d at 1152, this "error[] strongly weigh[s] in favor of vacatur." *See also Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1223 (finding that agency's failure to evaluate harmful impacts "goes to the heart of … NEPA").

So too with respect to the impacts of non-GHG air pollution that will be emitted when the coal from the Spring Creek Mine is burned. Rather than "describe the actual effects" of the approximately 100,000 tons of $SO_2$, $NO_x$, particulate matter, and mercury that is emitted annually when coal from the mine is burned, OSM simply "tallied" the emissions and discounted them as less than 1% of national totals. (Doc 102 at 18-19; AR:2-664-10781.) As with GHG emissions, this error undermined the disclosure and public participation goals of NEPA. *Se. Alaska Conservation Council*, 468 F. Supp. 3d at 1152. In fact, the coal plants that burn coal from the Spring Creek Mine cause hundreds of mortalities and thousands of cases of respiratory distress each year as result of their non-GHG emissions. Moench Decl., ¶ 4. The "[t]oxins from this coal combustion will also have a substantial and life-long adverse impact on the intellectual development of

13

children, limiting their quality of life, educational achievements, career options, and economic productivity." *Id.*, ¶ 26. As such, OSM's minimization of these significant impacts in its EA was a substantial failure that warrants the requested partial vacatur *Se. Alaska Conservation Council*, 468 F. Supp. 3d at 1152; *Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1223. In this circumstance, partial vacatur supports the strong interest in upholding and enforcing the rule of law. *See N. Plains Res. Council*, 460 F. Supp. 3d at 1049 (noting that "the public interest is best served when the law is followed" (quoting *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006))).

In sum, OSM has not demonstrated that its errors are not serious, and close analysis demonstrates that their seriousness warrants partial vacatur, as requested here.

**B.    Continued mining and combustion of coal from the Spring Creek Mine will cause extraordinary harm that greatly outweighs any disruptive consequences of partial vacatur.**

OSM also fails to carry its burden to demonstrate that partial vacatur would "cause *serious and irremediable harms* that *significantly outweigh* the magnitude of the agency's error." *WildEarth Guardians*, 2021 WL 2590143, at *21 (emphasis added). While the second element of the vacatur analysis "largely should focus on potential *environmental disruption*, as opposed to economic disruption," *N. Plains*

*Res. Council*, 460 F. Supp. 3d at 1038 (emphasis added),[5] OSM instead repeats the skewed analysis of its unlawful EA and omits *any discussion* of the substantial environmental disruption that will occur if mining continues in the expansion area. (Doc. 142 at 6-7; *cf.* Doc. 102 at 22-23 (noting "skewed" analysis that did not "fairly" balance economic benefits and environmental costs).)

Here, the environmental impacts of continued strip-mining in the expansion area will be devastating in multiple respects. The Spring Creek Mine is one of the largest coal mines and largest sources of air pollution in the nation. Moench Decl., ¶ 4. As noted, criteria pollution from combustion of the coal from the strip-mine causes significant premature death and disease each year, costing the public approximately $2.09 billion. Moench Decl., ¶ 4. "[I]t is hard to imagine any business should be allowed to operate if it causes this magnitude of economic, health, and mortality consequences." *Id.*, ¶ 28. The mine's climate impacts may be worse.

Both President Biden and Secretary Haaland recognize the grave state of climate change:

> United States international engagement to address climate change—
> which has become a climate crisis—is more necessary and urgent than
> ever. The scientific community has made clear that the scale and speed
> of necessary action is greater than previously believed. There is little

---

[5] *Accord Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1220.

time left to avoid setting the world on a dangerous, potentially
catastrophic, climate trajectory.

Exec. Order 14,008, § 101, 86 Fed. Reg. 7,619, 7,619 (Jan. 27, 2021); Dep't of

Interior, Sec. Order 3399, § 1 (recognizing need for U.S. Department of Interior to

address the "climate crisis"). Climate science agrees: global GHG concentrations

are "well into the danger zone." Declaration of James Hansen at 21 (Exhibit 4). In

a troubling disconnect with the Administration's climate policies, OSM's brief

ignores the massive climate change impacts of the strip-mine altogether. (*See* Doc.

142 at 6-7.)

In fact, the impacts of the mine's annual 30 million tons of $CO_2e$ (carbon

dioxide equivalent, a standard measure of GHGs) contribute to the devastating

effects of climate change, cause legions of mortalities from excessive heat, and

cost the public an additional approximately $1.5 billion in damage each year.

Moench Decl., ¶¶ 4, 27; Schlissel Decl., ¶¶ 2-5; Power Decl. ¶¶ 4-7. These

emissions are "simply incompatible with the project of restoring our planet's

energy balance, and thus a habitable climate system." Hansen Decl. at 22.

These impacts are not abstractions: they represent ongoing harm to the lives

of people in Montana, including members of Montana Environmental Information

Center (MEIC). This summer's extreme heat, fire, and drought—that burned entire

towns and killed hundreds of people and billions of animals in the West—would

have been "virtually impossible" in "the absence of climate change." Hansen

16

Decl., at 13-18. The Richard Spring Fire in southeastern Montana, driven by this

summer's unprecedented heat and drought, burned the ranches of MEIC members,

who were lucky to save their homes but are still trying to determine the fate of

their cattle. Declaration of Derf Johnson, ¶ 9 (Exhibit 5).

**Image 1:** Richard Spring Fire, Johnson Decl., ¶ 16.

Other members have lost their entire crops of wheat, lentils, safflower, and

corn due to extreme drought and fear the ever more hostile impacts as climate

change deepens. Declaration of Wade Sikorski, ¶¶ 10, 19-20 (Exhibit 6). All of

Guardians' members in Montana have suffered the relentless smoke waves and

unhealthy air this summer. Johnson Decl., ¶¶ 7, 13-14.



**Image 2:** Wheat crop lost to drought and heat in Baker, Montana. Sikorski Decl., ¶ 10.

The sheer magnitude of harm from continued strip-mining in the expansion

area of the Spring Creek Mine weighs heavily in favor of partial vacatur. *N. Plains*

*Res. Council*, 460 F. Supp. 3d at 1040-41 (finding that risk of environmental harm

supported partial vacatur); *League of Wilderness Defs./Blue Mountains*

*Biodiversity Project v. Pena*, No. 3:12-CV-02271-HZ, 2015 WL 1567444, at *6

(D. Or. Apr. 6, 2015) (ensuring preparation of EIS prior to start of "irreversible

logging project" supported vacatur).

By contrast, OSM's cursory description of negative consequences (Doc. 142

at 6-7) fails to identify "*serious and irremediable harms* that *significantly outweigh*

the magnitude of the agency's error." *WildEarth Guardians*, 2021 WL 2590143, at

*21 (emphasis added) (quoting *Se. Alaska Conservation Council*, 468 F. Supp. 3d

at 1150); *see also Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1226

(agency failed to carry burden that economic impacts would exceed environmental

consequences that agency failed to lawfully evaluate).

First, OSM briefly suggests that negative environmental consequences could

result from vacatur because complete vacatur would stop reclamation and

remediation activities at the strip-mine. (Doc. 142 at 6.) Guardians, however, does

not seek cessation of such activities. Rather, Guardians expressly requests that this

Court grant only partial vacatur that pauses strip-mining activities but allows

reclamation and remediation activities to continue during the pendency of the EIS

process. *See N. Plains Res. Council*, 460 F. Supp. 3d at 1039-40 (finding that

"partial vacatur … strikes a reasonable balance"); *Hunters*, 470 F. Supp. 3d at

1181-82 (granting partial vacatur). As such, there are no negative environmental

consequences that will result from the requested partial vacatur.

19

OSM also suggests that economic harm would come to "Spring Creek" (Doc. 142 at 6), but following its bankruptcy, Spring Creek Coal, LLC, no longer owns or operates the mine. (Doc. 90 at 2, 4.) NTEC acquired the mine in bankruptcy. (*Id.* at 4.) Because NTEC had notice of the risk of vacatur (Doc. 105 at 4), but accepted that risk in purchasing the mine, any potential harm to NTEC should be disregarded. *Conservation Cong. v. USFS*, 803 F. Supp. 2d 1126, 1133-34 (E.D. Cal. 2011).[6] Moreover, as this Court noted in denying NTEC's motion for a stay pending appeal, "purely monetary harm 'is not normally considered irreparable.'" (Doc. 140 at 4 (quoting *hiQ Labs., Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019)).) Further, "though economic disruption is properly considered, it is not commonly a basis, standing alone, for declining to vacate agency action." *Standing Rock Sioux*, 985 F.3d at 1051; *N. Plains Res. Council*, 460 F. Supp. 3d at 1039-40 (noting that remand without vacatur is appropriate upon a showing of the "combination of economically *and* environmentally harmful consequences" (emphasis in original)). Thus, concerns about the finances of Spring Creek or NTEC do not weigh against partial vacatur.

OSM cites language from Magistrate Judge Ostby's 2015 Findings and Recommendations, noting concerns with "duplication of efforts regarding the State

---

[6] *Accord Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1187 (9th Cir. 2000); *N. Plains Res. Council*, 460 F. Supp. 3d at 1045.

permitting process." (Doc. 142 at 6 (citing Doc. 71 at 41 (citing *WildEarth*

*Guardians v. OSM*, No. CV 14-13-BLG-SPW-CSO, 2015 WL 6442724, at *9 (D.

Mont. Oct. 23, 2015))).) Here, however, there is no longer any concurrent state

permitting process that would be duplicated. Further, even if there were a

concurrent state process (there is not), it would not consider the central issues in

this case, climate change impacts from large-scale coal combustion and

downstream coal transportation and combustion impacts. State law prohibits state

agencies from analyzing climate change or any impacts beyond state borders.

Mont. Code Ann. § 75-1-201(2)(a). Accordingly, concerns about duplication of

state efforts are no longer applicable and do not weigh against partial vacatur.

Without any elaboration, OSM mentions consequences for NTEC's

employees. (Doc. 142 at 6.) There is a strong national interest in supporting the

"economic revitalization of and investment in" energy communities "[a]s the

Nation shifts to a clean energy economy." Exec. Order 14,008, § 217, 86 Fed. Reg.

at 7,627-28. The County Commissioners of Big Horn County recognize the need

for this transition to clean energy. (Doc. 105-1, ¶ 13 (explaining that the "County is

actively planning for a future with substantially less revenue from coal").) To this

end, the Biden Administration established the "Interagency Working Group on

Coal and Power Plant Communities and Economic Revitalization," which includes

Defendant Department of Interior. Exec. Order 14,008, § 218, 86 Fed. Reg. at

21

7,628. In April 2021, this working group issued its initial report identifying $38

billion available for "immediate investment" in energy communities and further

identifying the communities around the Spring Creek Mine (particularly Sheridan,

Wyoming, where virtually all mine employees (232 of 245) live (Doc. 105-7,

¶ 29)) as a priority for support.[7] This federal initiative will mitigate any impacts of

partial vacatur on miners and local communities.

Additional mitigating factors include the requested partial vacatur that

allows reclamation and remediation work to continue pending remand, as well as

the fact that partial vacatur is only temporary, i.e., for the pendency of the EIS

process. *Standing Rock Sioux*, 985 F.3d at 1051 (noting temporary nature of

vacatur pending NEPA review would mitigate any disruptive effects); *see also*

*League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2015)

(holding "permanent" environmental harm outweighs "temporary delay" of

project). Further, granting a three-month deferral of partial vacatur would allow for

an orderly winding down of mining operations in the expansion area to minimize

impacts to miners and communities. *See N. Plains Res. Council*, 460 F. Supp. 3d at

---

[7] Interagency Working Group on Coal and Power Plant Communities and
Economic Revitalization, Initial Report to the President on Empowering Workers
Through Revitalizing Energy Communities, at 2, 6 (April 2021), *available at*
https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/23/fact-
sheet-biden-administration-outlines-key-resources-to-invest-in-coal-and-power-
plant-community-economic-revitalization/ (Exhibit 7).

1039-40 (finding that partial vacatur allowing environmentally benign activities to continue but vacating action with respect activities that posed more "servere risk" "str[uck] a reasonable balance"); *Hunters*, 470 F. Supp. 3d at 1181-82 (granting partial vacatur to balance interests); *Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1226 (same). Any residual impacts of partial vacatur are the "result of the agency's failure to follow the law in the first instance." *N. Plains Res. Council*, 460 F. Supp. 3d at 1045 (cleaned up) (quoting *Swan View Coal. v. Weber*, 52 F. Supp. 3d 1160, 1161-62 (D. Mont. 2014)); *Diné Citizens Against Ruining Our Env.'t v. OSM*, No. 12-cv-1275-JLK, 2015 WL 1593995, at *3 (D. Colo. Apr. 6, 2015) (finding that "the responsibility for … delay and expense [of vacatur] lies with Respondents [OSM] and not with Petitioners").

Finally, the cases cited by OSM do not counsel against partial vacatur, as requested here by Guardians. *WildEarth Guardians*, 2021 WL 2590143, at *22-23,[8] found that the agency's errors were limited in scope and that vacatur would result in significant economic *and* environmental impacts. Here, by contrast, OSM acknowledges that its repeated errors cannot be remedied with an EA, but require

---

[8] In *WildEarth Guardians v. OSM*, No. 14-cv-112 (D.N.M. Aug. 31, 2016), which OSM also cites, plaintiffs did not oppose deferral of vacatur following an agency's decision to voluntarily remand its decision. *Id.*, slip op. at 3-5. As such, it has no bearing on the instant case, where OSM's decision was (twice) found unlawful and deferral of vacatur is opposed.

an expanded analysis in an EIS. And, as noted, here the significant environmental harms will result, not from partial vacatur, but from deferral of vacatur. *N. Plains Res. Council*, 460 F. Supp. 3d at 1038 (environmental harm is central focus in assessing disruptive consequences); *Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1220 (same). Further, as noted, any economic harm to NTEC is self-inflicted and therefore not cognizable, and any additional economic impacts can be mitigated. In any event, in a fair comparison, the sheer magnitude of the economic and environmental harm from continued operations of the Spring Creek Mine substantially outweighs any harm associated with a temporary cessation of strip-mining in the expansion area. Moench Decl., ¶¶ 4, 28; Schlissel Decl., ¶ 5; Power Decl., ¶¶ 4-7; Hansen Decl. at 22; *Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1226 (environmental harms outweighed economic impacts supporting partial vacatur); *Se. Alaska Conservation Council*, 468 F. Supp. 3d at 1151 (same); *Diné Citizens*, 2015 WL 1593995, at *3 (same); *see also Sovereign Iñupiat for a Living Arctic v. BLM*, No. 3:20-cv-290-SLG, slip op. at 107-08 (D. Alaska Aug. 18, 2021) (holding failure lawfully to analyze downstream GHG emissions warranted vacatur of oil and gas project).

In short, the environmental impacts of continued strip-mining are devastating, both in terms of loss of life and economic losses. Any impacts of a temporary cessation of mining are self-inflicted by OSM and NTEC and may be

mitigated by the requested partial vacatur. As such, OSM's conclusory argument has not carried its burden to demonstrate that partial vacatur will "cause *serious and irremediable harms* that *significantly outweigh* the magnitude of the agency's error." *WildEarth Guardians*, 2021 WL 2590143, at *21 (emphasis added) (quoting *Se. Alaska Conservation Council*, 468 F. Supp. 3d at 1150).

## CONCLUSION

In conclusion, Guardians does not oppose OSM's requested extension of time to prepare an EIS. However, Guardians respectfully requests that this Court deny OSM's request to defer vacatur until March 2023, which is not warranted in law or equity. Instead, Guardians seeks a compromise remedy and, accordingly, request that this Court grant partial vacatur prohibiting mining in the expansion area pending the EIS process, but allowing reclamation and remediation activities to continue. Moreover, Guardians further requests that this Court defer partial vacatur (and thereby allow mining operations) for three months, until January 1, 2022, to allow an orderly winding down of mining operations. This remedy assures protection of people and the environment and upholds the rule of law.

Respectfully submitted this 19th day of August, 2021.

/s/ Shiloh Hernandez
Shiloh S. Hernandez
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743

25

T: 406.586.9692 ext. 1929
shernandez@earthjustice.org

Melissa A. Hornbein
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 204-4852
hornbein@westernlaw.org

*Attorneys for Plaintiffs*

Samantha Ruscavage-Barz (NM Bar
#23276)
WildEarth Guardians
516 Alto St.
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org
*Admitted pro hac vice*

*Counsel for Plaintiff WildEarth Guardians*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that the foregoing brief contains 5,359 words, excluding caption, certificate of compliance, tables of contents and authorities, exhibit index, and signature block. I relied on a word-processing system to obtain this word count.

/s/ Shiloh Hernandez
Shiloh S. Hernandez